ALABAMA POWER CO. *v.* ICKES, FEDERAL EMERGENCY ADMINISTRATOR OF PUBLIC WORKS, ET AL.

Nos. 84 and 85. Argued December 6, 7, 1937.—Decided January 3, 1938.

*Mr. William H. Thompson,* with whom *Messrs. Perry W. Turner, Newton D. Baker, R. T. Jackson, Dean Acheson, Thomas V. Koykka, Wayne G. Cook* and *J. Harry Covington* were on the brief, for petitioner.

466

468

470

*Messrs. Jerome N. Frank* and *Solicitor General Reed,* with whom *Attorney General Cummings, Assistant Attorney General Morris,* and *Messrs. Enoch E. Ellison* and *Robert E. Sher* were on the brief, for the respondent Administrator.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

These cases involve certain "loan-and-grant agreements" made by the Federal Emergency Administrator of Public Works with four municipal corporations located in the State of Alabama. The bills of complaint sought to enjoin the execution of these agreements. Each agreement contemplates the construction of an electricity-distribution system by the designated municipality, and, to that end, the purchase, by the administrator, of bonds to be issued by the municipality and secured by a first pledge of the revenues derived from the operation of the system. In No. 84 thirty and in No. 85 forty-five per cent. of the cost of the labor and materials used in the construction are to be donated outright. The authority relied upon for the loans and grants is that contained in Title II of the National Industrial Recovery Act [1] as modified and continued by the Emergency Relief Appropriation Act of 1935.[2] Title I of the former act has been declared unconstitutional by this court. *Schechter Corp.* v. *United States*, 295 U. S. 495; *Panama Refining Co.* v. *Ryan*, 293 U. S. 388. But we are here concerned not with Title I

---

[1] C. 90, 48 Stat. 195, 200.
[2] C. 48, 49 Stat. 115, 119.

but with Title II of the act. So far as material, that title provides:

"Sec. 202. The Administrator, under the direction of the President, shall prepare a comprehensive program of public works, which shall include among other things the following: (a) Construction, repair, and improvement of public highways and park ways, public buildings, and any publicly owned instrumentalities and facilities; (b) conservation and development of natural resources, including control, utilization, and purification of waters, prevention of soil or coastal erosion, development of water power, transmission of electrical energy, . . . ; (c) any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public; (d) construction, reconstruction, alteration, or repair under public regulation or control of low-cost housing and slum-clearance projects; (e) any project (other than those included in the foregoing classes) of any character heretofore eligible for loans under subsection (a) of section 201 of the Emergency Relief and Construction Act of 1932, as amended, . . .

"Sec. 203. (a) With a view to increasing employment quickly (while reasonably securing any loans made by the United States) the President is authorized and empowered, through the Administrator or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 202; (2) upon such terms as the President shall prescribe, to make grants to States, municipalities, or other public bodies for the construction, repair, or improvement of any such project, but no such grant shall be in excess of 30 [by later act 45] per centum of the cost of the labor and materials employed upon such project; . . ."

The bills of complaint challenge the validity of the loans and grants on the grounds, among others, that these statutory provisions purporting to authorize such loans and grants are unconstitutional; and that, in any event, the loans and grants do not come within the statutory provisions.

The injury which petitioner will suffer, it is contended, is the loss of its business as a result of the use of the loans and grants by the municipalities in setting up and maintaining rival and competing plants; a result, it is further contended, which will be directly caused by the unlawful act of the administrator in making and consummating the loan-and-grant agreements.

The suits were brought in the United States District Court for the District of Columbia. There, the respondents, in addition to defending the validity of the action of the administrator, contended that petitioner was without legal standing to maintain the suits. After a full hearing, the district court held that petitioner had standing to challenge the administrator's action, but denied the injunctions and dismissed the bills of complaint upon the view that the statutory provisions were constitutional and that they conferred upon the administrator the power which he had exercised.

On appeal to the United States Court of Appeals for the District of Columbia, that court found it unnecessary to consider the validity of the loans and grants, and affirmed the decrees of the district court dismissing the bills on the ground that no legal or equitable right of the power company had been invaded, and the company, therefore, was without standing to challenge the validity of the administrator's acts. 91 F. (2d) 303. With that view we agree, and confine our consideration of the cases accordingly.

The trial court made elaborate findings, but for present purposes the following is all that need be stated. Peti-

476

tioner is a corporation organized under the laws of Alabama, having its principal office and corporate domicile in that state. Respondent Ickes is the Administrator of the Federal Emergency Administration of Public Works, duly appointed by the President of the United States in pursuance of law. The other respondents are subordinate officers and agents of the same Emergency Administration, or officers connected with its operations.

Petitioner, under its charter, has the right to manufacture, supply and sell electrical energy throughout the State of Alabama. Among other communities served by its system are the four municipalities here involved, from each of which it has a non-exclusive franchise giving it the right to construct, maintain and operate within the municipality an electricity-distribution system. Petitioner is a taxpayer of each of the municipalities, of the counties in which they are located, and of the state, with respect to petitioner's properties and operations; and it also is a taxpayer of the United States with respect thereto.

Each of the municipalities is authorized under state law to construct and operate municipal electric plants and distribution systems, and to engage in competition with petitioner. Each is authorized to issue bonds for the purpose of financing the construction of such plants and to receive grants for that purpose; to mortgage its plant or any part of it and to pledge all or any part of the revenues derived from the operation of the plant as security for the loan.[3] In each municipality an election was held prior to the making of the loan agreements, at which it was determined by a majority of the qualified voters that the municipality should engage in the electric business. The district court further found—

"Each of the municipalities involved in this suit determined to enter into the electric distribution business of

[3] See *Oppenheim* v. *City of Florence*, 229 Ala. 50; 155 So. 859.

its own free will. There was no solicitation or coercion on the part of any of the defendants [respondents], their agents or subordinates. There was and is no conspiracy between any of the defendants and any other person, nor is there any other effort on the part of any of the defendants to, nor are their actions motivated by a desire to, cause injury or financial loss to the plaintiffs, or to regulate their rates or electric rates generally, or to foster municipal ownership of utilities.

"The expenditures under these statutes involve no purchase of, nor contract providing for, regulation by the United States. The failure of any city to apply for or receive loans or grants under those statutes will impose upon it no disadvantage or financial loss.

"The defendants have not reserved any right or power to influence or control rates to be charged by the proposed municipal power plants. . . .

"Neither the United States nor any of the defendants has reserved any right or power under the existing contracts, or in any other way, to require any of the municipalities to eliminate competition or to designate the person or agency from whom the municipality must purchase its power. . . .

"Neither the United States nor any of the defendants has any power to control the operation of the projects after construction is completed. . . .

"Each of the projects herein involved is a part of a program of national scope, is designed to relieve unemployment, and promotes the general welfare of the United States."

These findings were made, after hearing, by the district judge upon undisputed or conflicting evidence. The findings were not questioned by the court below; and since they are not without substantial support in the evidence, we accept them here as unassailable. *Davis* v. *Schwartz,* 155 U. S. 631, 636–637; *Adamson* v. *Gilliland,* 242 U. S. 350, 353.

It, therefore, appears that each of the municipalities in question has authority to construct and operate its proposed plant and distribution system in competition with petitioner, and to borrow money, issue bonds and receive grants for that purpose; that it determined to do so of its own free will, without solicitation or coercion; that there was no conspiracy between any of the respondents and any other person, or any effort or action motivated by a desire to cause injury or financial loss to petitioner, or any purpose to regulate rates or foster municipal ownership of utilities. It further appears that neither the United States nor any of the respondents has reserved any right or power to require an elimination of competition or designate any agency from which the municipality must purchase its power. Each municipality is left entirely free from federal control or direction in respect of the management and control of its plant and business. In short, the case for petitioner comes down to the contention that consummation of the loan-and-grant agreements should be enjoined on the sole and detached ground that the administrator lacks constitutional and statutory authority to make them, and that the resulting moneys, which the municipalities have clear authority to take, will be used by the municipalities in lawful, albeit destructive, competition with petitioner.

*First.* Unless a different conclusion is required from the mere fact that petitioner will sustain financial loss by reason of the lawful competition which will result from the use by the municipalities of the proposed loans and grants, it is clear that petitioner has no such interest and will sustain no such legal injury as enables it to maintain the present suits. Petitioner alleges that it is a taxpayer; but the interest of a taxpayer in the moneys of the federal treasury furnishes no basis for an appeal to the preventive powers of a court of equity. *Massachusetts* v. *Mellon,* 262 U. S. 447, 486 *et seq.* The principle estab-

lished by the case just cited is that the courts have no power to consider in isolation and annul an act of Congress on the ground that it is unconstitutional; but may consider that question "only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act." The term "direct injury" is there used in its legal sense, as meaning a wrong which directly results in the violation of a legal right. "An injury, legally speaking, consists of a wrong done to a person, or, in other words, a violation of his right. It is an ancient maxim, that a damage to one, without an injury in this sense, (*damnum absque injuria*), does not lay the foundation of an action; because, if the act complained of does not violate any of his legal rights, it is obvious, that he has no cause to complain. . . . Want of right and want of remedy are justly said to be reciprocal. Where therefore there has been a violation of a right, the person injured is entitled to an action." *Parker* v. *Griswold*, 17 Conn. 288, 302–303. The converse is equally true, that where, although there is damage, there is no violation of a right no action can be maintained.

*Second.* The only pertinent inquiry, then, is what enforceable legal right of petitioner do the alleged wrongful agreements invade or threaten? If conspiracy or fraud or malice or coercion were involved a different case would be presented, but in their absence, plainly enough, the *mere* consummation of the loans and grants will not constitute an actionable wrong. Nor will the subsequent application by the municipalities of the moneys derived therefrom give rise to an actionable wrong, since such application, being lawful, will invade no legal right of petitioner. The claim that petitioner will be injured, perhaps ruined, by the competition of the municipalities brought about by the use of the moneys, therefore, presents a clear case of *damnum absque injuria*. Stated in

other words, these municipalities have the right under state law to engage in the business in competition with petitioner, since it has been given no exclusive franchise. If its business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition from which no legal wrong results.

What petitioner anticipates, we emphasize, is damage to something it does not possess—namely, a right to be immune from lawful municipal competition. No other claim of right is involved. It is, in principle, as though an unauthorized loan were about to be made to enable the borrower to purchase a piece of property in respect of which he had a right, equally with a prospective complainant, to become the buyer. While the loan might frustrate complainant's hopes of a profitable investment, it would not violate any legal right; and he would have no standing to ask the aid of a court to stop the loan. What difference, in real substance, is there between the case supposed and the one in hand?

The ultimate question which, therefore, emerges is one of great breadth. Can anyone who will suffer injurious consequences from the lawful use of money about to be unlawfully loaned maintain a suit to enjoin the loan? An affirmative answer would produce novel and startling results. And that question suggests another: Should the loan be consummated, may such a one sue for damages? If so, upon what ground may he sue either the person making the loan or the person receiving it? Considered apart, the lender owes the sufferer no enforcible duty to refrain from making the unauthorized loan; and the borrower owes him no obligation to refrain from using the proceeds in any lawful way the borrower may choose. If such a suit can be maintained, similar suits by innumerable persons are likewise admissible to determine whether money is being loaned without lawful authority for uses which, although hurtful to the complainants,

are perfectly lawful. The supposition opens a vista of litigation hitherto unrevealed.

John Doe, let us suppose, is engaged in operating a grocery store. Richard Roe, desiring to open a rival and competing establishment, seeks a loan from a manufacturing concern which, under its charter, is without authority to make the loan. The loan, if made, will be *ultra vires*. The state or a stockholder of the corporation, perhaps a creditor in some circumstances, may, upon that ground, enjoin the loan. But may it be enjoined at the suit of John Doe, a stranger to the corporation, because the lawful use of the money will prove injurious to him and this result is foreseen and expected both by the lender and the borrower, Richard Roe? Certainly not, unless we are prepared to lay down the general rule that A, who will suffer damage from the lawful act of B, and who plainly will have no case against B, may nevertheless invoke judicial aid to restrain a third party, acting without authority, from furnishing means which will enable B to do what the law permits him to do. Such a rule would be opposed to sound reason, as we have already tried to show, and cannot be accepted.

If there are conditions under which two distinct transactions, neither of which, apart, constitutes a judicially remediable wrong, may be so related to one another as to afford a basis for judicial relief, such conditions are not to be found in the circumstances of the present case.

What we have now said finds ample support in the decided cases. Among the decisions of this court, and directly in point, is *Railroad Co.* v. *Ellerman,* 105 U. S. 166. In that case, the railroad company was authorized by its charter, among other things, to obtain and afterwards manage, use and enjoy, wharves and the appurtenances thereto "in connection with its railroads." A Louisiana statute conferred upon the railroad the power to obtain and thereafter to own, maintain and use, suitable wharves,

etc., "connected with and incidental to said railroad."
Pursuant to this authority, the railroad company acquired
property which it used as a wharf and which, although
limited by the statute and its charter to use for railroad
purposes, it leased to certain persons for the mooring
of vessels and the loading and unloading of cargoes upon
and from all vessels of a kind designated. Ellerman oper-
ated certain public wharves under a contract with the
city of New Orleans giving him the right to collect reve-
nues derived therefrom. He brought suit to enjoin the
execution of the lease of the railroad wharf. This court
held that he was without legal standing to maintain the
suit—his only interest being to prevent competition with
himself as a wharfinger, which the more extensive and
challenged use by the lessees of the railroad wharf would
create, and his claim for relief resting only upon the
allegation that the use proposed by the lease was beyond
the corporate power of the railroad company to grant.
"But if the competition in itself, however injurious," we
said, pp. 173–174, "is not a wrong of which he could com-
plain against a natural person, being the riparian pro-
prietor, how does it become so merely because the author
of it is a corporation acting *ultra vires?* The damage is
attributable to the competition, and to that alone. But
the competition is not illegal. It is not unlawful for any
one to compete with the company, although the latter
may not be authorized to engage in the same business.
The legal interest which qualifies a complainant other
than the State itself to sue in such a case is a pecuniary
interest in preventing the defendant from doing an act
where the injury alleged flows from its quality and char-
acter as a breach of some legal or equitable duty. A
stockholder of the company has such an interest in re-
straining it within the limits of the enterprise for which
it was formed, because that is to enforce his contract of
membership. The State has a legal interest in prevent-

ing the usurpation and perversion of its franchises, because it is a trustee of its powers for uses strictly public. In these questions the appellee has no interest, and he cannot raise them in order, under that cover, to create and protect a monopoly which the law does not give him. The only injury of which he can be heard in a judicial tribunal to complain is the invasion of some legal or equitable right. If he asserts that the competition of the railroad company damages him, the answer is, that it does not abridge or impair any such right. If he alleges that the railroad company is acting beyond the warrant of the law, the answer is, that a violation of its charter does not of itself injuriously affect any of his rights. The company is not shown to owe him any duty which it has not performed." Supporting cases are cited. See, also, *U. S. ex rel. New York Warehouse, W. & T. Assn.* v. *Dern,* 68 F. (2d) 773. Compare *Edward Hines Trustees* v. *United States,* 263 U. S. 143, 148; *Alexander Sprunt & Son* v. *United States,* 281 U. S. 249, 256–257; *Milwaukee Horse & Cow Comm'n Co.* v. *Hill,* 207 Wis. 420, 423, 430–432; 241 N. W. 364.

The *Chicago Junction Case,* 264 U. S. 258, is not to the contrary. There, suit was brought by certain railroad companies to set aside an order of the Interstate Commerce Commission authorizing a competing company to acquire a terminal road. Answering the contention that complainants were without the legal interest necessary to entitle them to challenge the order, this court held that the right to sue arose in virtue of a special interest recognized by certain provisions contained in Transportation Act, 1920, and under § 212 of the Judicial Code which gave any party to a proceeding before the commission the right to become a party to any suit wherein the validity of an order made in the proceeding is involved. In this view, the *Ellerman* case was thought to be inapplicable. A reading of the case in connection with the

dissenting opinion shows very clearly that, but for express statutory provision creating a different rule, the decision in the *Ellerman* case would have been controlling.

The precise question here involved was decided, in accordance with the view we have expressed, in *Duke Power Co.* v. *Greenwood County,* 91 F. (2d) 665, 676; same case, 81 F. (2d) 986, 997. Compare *Arkansas-Missouri Power Co.* v. *Kennett,* 78 F. (2d) 911. See, also, *Allegan* v. *Consumers' Power Co.,* 71 F. (2d) 477. The *Greenwood County* case, *supra,* is now pending in this court upon certiorari, and will be determined upon the authority of our present decision.

*Frost* v. *Corporation Commission,* 278 U. S. 515, relied upon by petitioner, presents an altogether different situation. Appellant there owned a cotton-ginning business in the city of Durant, Oklahoma, for the operation of which he had a license from the corporation commission. The law of Oklahoma provided that no gin should be operated without a license from the commission, which could be obtained only upon specified conditions. We held that such a license was a franchise constituting a property right within the protection of the Fourteenth Amendment; and that while the acquisition of the franchise did not preclude the state from making similar valid grants to others, it was exclusive against an attempt to operate a competing gin without a permit or under a void permit. The Durant Co-operative Gin Company sought to obtain a permit from the commission which, for reasons stated in our opinion, we held would be void and a clear invasion of Frost's property rights. We concluded that a legal right of Frost to be free from such competition would be invaded by one not having a valid franchise to compete, and sustained Frost's right to an injunction against the commission and the Durant company. See *Corporation Commission* v. *Lowe,* 281 U. S. 431, 435. The difference between the *Frost* case and

this is fundamental; for the competition contemplated there was unlawful while that of the municipalities contemplated here is entirely lawful.

We deem it unnecessary to review the many other cases cited by petitioner where suits against officials have been sustained. An examination of them will disclose the presence of fraud, coercion, malice, conspiracy, or some other element or condition of controlling force—none of which, as shown by the findings which we have accepted as unassailable, exists in the present case.

*Decrees affirmed.*

MR. JUSTICE BLACK concurs in the result.