MONTANA–DAKOTA UTILITIES CO., Appellant, *v.* CITY
OF HAVRE et al., Respondents.

(No. 7,971.)

(Submitted June 30, 1939. Decided August 7, 1939.)

[94 Pac. (2d) 660.]

166

*Mr. A. F. Lamey* and *Messrs. Faegre, Benson & Krause,* of the Bar of Minneapolis, Minnesota, for Appellant, submitted an original and a reply brief; *Mr. Lamey* argued the cause orally.

*Mr. S. C. Ford* and *Mr. Sam D. Goza, Jr.,* as *Amici Curiae,* permitted to appear in behalf of certain owners of land from which gas is taken and distributed by appellant, submitted a brief; *Mr. Ford* argued the cause orally.

*Mr. Peter M. Rigg, Mr. H. S. Kline, Mr. Melvin N. Hoiness, Mr. Franklin S. Longan* and *Messrs. Rockwood Brown & Hor-*

*ace S. Davis,* for Respondents, submitted an original and a supplemental brief; *Mr. Rigg* and *Mr. Davis* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This action was brought to enjoin the city of Havre and its officers from executing and delivering revenue bonds to the Federal Public Works Administration and to enjoin them from carrying out certain contracts and resolutions pertaining to the construction of a gas distribution system and pipe line and the purchase of natural gas for distribution in that city, on the principal ground that the proposed project will result in unlawful competition to plaintiff.

Plaintiff is a taxpayer on real and personal property in Havre, where it is engaged as a public utility in distributing natural gas to its customers therein under a thirty-year franchise granted by the city to the Havre Natural Gas Company in 1914, and which was later acquired by plaintiff by assignment with the consent of the city. It transports its gas by a pipe line a distance of twenty-four miles from what is known as the Bowes Structure in Blaine county. Judgment went in favor of defendants, and plaintiff appealed.

The important facts are uncontradicted and may be fairly depicted by giving a brief résumé of the court's findings, which were in substance as follows:

That defendant McMaster is the duly elected and acting mayor of the city; White, the city clerk; Harlan, the city treasurer, and Koerner, Hontz, Soderberg, Lanham, Oglesby and Sowa, its aldermen; that on September 10, 1935, the city council by resolution authorized its mayor and city engineer to file an application with the Federal Emergency Administration of Public Works (hereinafter referred to as the P. W. A.), for a loan and grant to finance the construction of a municipal gas distribution system and supply line; that on September 10, 1935, defendants C. O. Moore and C. O. Moore Company were employed by the city as engineers to obtain and furnish

information to the P. W. A. in connection with the application and to furnish plans and specifications in connection with the proposed project and have ever since acted in that capacity; that on November 24, 1936, the United States, acting through the P. W. A., made an offer to the city (which was by its terms required to be accepted by the city within ten days) to aid in the proposed project by offering to make a grant in the amount of 45 per cent. of the cost of the project upon completion, but not to exceed the sum of $73,636, and by purchasing at the principal amount, plus accrued interest, obligations of certain designated description, in the aggregate principal amount of $90,000. On December 7, 1936, the city by resolution accepted the offer, and on that date the city entered into a contract or agreement with the United States, acting through the P. W. A., wherein the city agreed to acquire and construct a natural gas distribution system, complete with supply lines and necessary equipment, including a natural gas supply, and the United States, acting through the P. W. A., agreed to finance the same as hereinabove stated. On May 4, 1937, the city entered into a gas purchase contract with defendant Browne, Trustee, by the terms of which Browne agreed to sell and the city to buy for a period of twenty years from wells to be drilled on certain described lands and on other lands that might be acquired by him as Trustee at prices and upon conditions therein stated, up to the city's full requirements. On September 30, 1937, by a supplemental contract, the agreement of May 4th was modified to make it clear that the city must buy gas from Browne exclusively so long as he was able to fill its requirements, and to give him thirty days to make provision if the city should require a greater supply of gas than theretofore estimated (stated in the bid proposal to be five hundred million cubic feet annually).

The original contract for the purchase of gas was let after an election was held at which the voters by their favorable vote authorized the city to enter into a gas purchasing contract. The election was held on April 5, 1937, at which the voters were called upon to vote for or against "authorizing

the City Council of the City of Havre, Montana, to enter into a contract for the purchase of an adequate and suitable supply of natural gas to fully satisfy the needs and requirements of domestic, commercial and industrial consumers of the said City of Havre and vicinity that may apply and be presently connected to the City's Municipal Gas Distribution System presently to be built, at a cost of not to exceed 5¢ per thousand Cubic Feet at the gas well, or not to exceed 12¢ per thousand Cu. Ft. for industrial (meaning consumers using 200 M. C. F. or more each day) and 15¢ per thousand Cu. Ft. for all other gas required by other consumers without classification to be delivered to the City of Havre's gas supply line and measuring station within ten (10) miles of the corporate limits of the City of Havre, Montana, such contract to extend over a period of not exceeding twenty (20) years, and to be on such terms and upon such conditions as may be agreed upon by the City Council of the City of Havre, Montana, and the party or parties agreeing to furnish said natural gas supply after competitive bidding therefor and compliance by the City Council of the City of Havre with the preliminaries prescribed by law."

On November 20, 1937, Browne, Trustee, with the consent of the city, sold and assigned to defendants Catlett, Hobson and Smith the right to supply gas under the contract and the supplemental contract from certain designated lands owned or controlled by them, with the proviso that they drill thereon such wells as might become necessary to supply the gas. On November 30th thereafter the city accepted a proposal of defendant McLaughlin to build and finance the necessary pipe line to connect the project with the gas supply, and on the same day Browne, Trustee, granted an option to McLaughlin whereby Browne, Trustee, agreed to sell to McLaughlin all of the balance of his right, title and interest in the gas purchase contract and supplemental contract, being the right to transmit the gas from the wells to the city's ten-mile line. On December 31, 1937, the city entered into a supplemental gas purchase contract with Catlett, Hobson and Smith (designated

as the "producers") and McLaughlin (designated as the "contractor"), under which it was agreed that the producers "shall not be deemed liable to furnish gas in excess of the amount which can be produced from their respective holdings as set forth in their said agreements with Frank Browne, dated November 20, 1937," and providing that the producers' rights and liabilities were fixed by the new agreement, and that its provisions should apply if in conflict with the provisions of "said gas purchase contract, supplemental gas purchase contract, or said agreements with Frank Browne, Trustee" (the assignment agreements of November 20, 1937). By this agreement the city released Catlett, Hobson and Smith from their absolute engagement to furnish it the required gas, except such as they might be able to produce from the designated land. On January 22, 1938, the city made another agreement with Catlett, Hobson and Smith which further modified the agreement of December 31, 1937, so as to provide that they should not during the twenty-year period of the contract sell to any purchaser other than the city, gas "from their respective acreages in said contract referred to"; and which then went on expressly to describe "the lands herein referred to," so as substantially to change the description of Catlett's land and gas interests, and to reduce by over two-thirds the lands whose entire production Smith agreed to supply.

On January 22, 1938, McLaughlin submitted a bid to the city for the construction of the distribution system, which bid was accepted by the city. On May 11, 1937, the city authorized the issuance and sale of revenue bonds to the United States of America in the sum of $90,000 to pay part of the cost of its proposed distribution system. The court expressly found that the defendant Soderberg had at no time any interest in any of the contracts referred to as alleged in the complaint, and that all resolutions and ordinances relating to the contracts were passed and approved by the affirmative vote of a majority of the members of the city council, not counting the vote of Soderberg.

It has been determined by the Supreme Court of the United States that a utility company holding a non-exclusive franchise from a municipality, such as that of plaintiff here, is not subjected to unlawful competition by the act of the federal government in making a grant and loan to the municipality for the purpose of constructing a competitive enterprise (*Alabama Power Co.* v. *Ickes*, 302 U. S. 464, 58 Sup. Ct. 300, 82 L. Ed. 374), providing there is lawful authority for the municipality to go forward with the project. (*Frost* v. *Corporation Com.*, 278 U. S. 515, 49 Sup. Ct. 235, 73 L. Ed. 483; *Arkansas-Missouri Power Co.* v. *Kennett*, (8 Cir.) 78 Fed. (2d) 911.)

The plaintiff contends that Chapter 141, Laws of 1935, the authority upon which the undertaking of the city of Havre is here based, has been repealed by Chapters 108 and 115, Laws of 1937. There was no express repeal and if we hold that a repeal has occurred, it must have been by implication. To work this repeal by implication it must appear that the latter statutes are plainly and irreconcilably in conflict with the former. "[They] must relate to the same subject; and have the same object in view." (*Box* v. *Duncan,* 98 Mont. 216, 38 Pac. (2d) 986, 987; *State ex rel. Esgar* v. *District Court,* 56 Mont. 464, 185 Pac. 157.)

Chapter 141 of the Laws of 1935 is what is known as "The Revenue Bond Act of 1935." The purpose of the Act is to authorize municipalities to create self-supporting undertakings in the nature of furnishing facilities for the distribution of water, gas and heat, and facilities for sewage disposal. The Act particularly provides that bonds may be issued but must be paid for from the revenue only, and that the obligation is not a general obligation of the municipalities, and that the holder of bonds issued under the Act may never compel the exercise of the taxing power to pay the bonds or interest.

Chapters 108 and 115 of the Laws of 1937 went into effect March 15, 1937, and if they repealed Chapter 141, supra, the authority under which the city seeks to issue the bonds no longer exists. In order to determine whether there has been

a repeal by implication it is necessary to compare Chapters 108 and 115 with Chapter 141.

Chapter 108 amends sections 5278.1 and 5278.6, Revised Codes. These sections appear in the Political Code under Chapter 399, entitled "Municipal Bonds And Indebtedness." Section 5278.1 provides: "Whenever the council of any city or town having a corporate existence in this state, or hereafter organized under any of the laws thereof, shall deem it necessary to issue bonds for any purpose whatever, under its powers as set forth in section 5039.63, or amendments thereto, the question of issuing such bonds shall first be submitted to the qualified electors of such city or town in the manner hereinafter set forth." Section 5278.6 provides for the procedure for calling and holding the election. Section 5039.63 gives a city or town council authority to contract indebtedness for the erecting of public buildings, constructing sewers, bridges, waterworks, lighting plants, etc., but does not include gas works. Chapter 108 amended section 5278.1 by striking out the words "section 5039.63" and inserting in lieu thereof the words "any statute or statutes of the State of Montana." It also amended section 5278.6 in respects not material here.

The plaintiff contends that Chapter 108 relates to *any* bond issue, whether payable from taxation or revenue, and requires a submission to the qualified electors, and that by virtue of the fact that Chapter 141 does not require a submission on a revenue bond, then the two are inconsistent; that they cannot stand together and therefore the later repeals the earlier. This position is not tenable for the reason that the two chapters can be construed so as to stand together. Chapter 108 amends a section which appears in the chapter of the Political Code relating to indebtedness of a municipality as a burden on the taxable property. It is a reasonable construction of the language of Chapter 108 to say that the words "any bond issue" under "any statute or statutes of the State of Montana" mean any bonds issued under a statute making such bonds payable by use of the taxing power. The title to Chapter 108 relates, and we think was intended to relate, only to the creation of an

obligation which is dependent on the taxing power for payment. If the statute dealt with the type of obligation created by Chapter 141, or obligations solely dependent on the revenue of the undertaking for payment, then the chapter dealt with a subject not expressed in the title. For these reasons it is our opinion that the legislature did not, in amending the Code sections by enacting Chapter 108, interfere with the power granted under Chapter 141.

It is plain, too, that Chapter 115 of the Laws of 1937, does not repeal Chapter 141 of the Laws of 1935. Chapter 115 is an emergency statute authorizing the counties, cities, towns and other state agencies to undertake a program of public works, and to issue bonds for such purpose. The Act duplicates Chapter 141 in that in section 3, Part VI, the agencies are given power to contract for the construction of any project to be paid for from the revenue such project produced. The Act does not specify that the issuance of revenue bonds shall be submitted to a vote. The Act does, however, in section 5, Part (a), provide that "no *lease or contract* shall be entered into and no debt or liability shall be incurred or created * * * for the payment of any part of which taxes will be levied," without an election. That this Act was not intended to interfere with Chapter 141 is expressed in the last section: "This Act shall not repeal any statute now in force nor prevent the exercise of powers as elsewhere in the statutes of this State provided. It shall constitute an additional method of carrying out the powers herein authorized."

Section 6 of Chapter 115 provides: "Where proceedings have been commenced prior to the enactment of this chapter which would have been authorized under this law for the purposes described herein, such proceeding shall be held valid and sufficient, and shall authorize the completion of such proceedings under this law; and said proceedings, when so completed, shall be of the same force and effect as if this law had been in effect when said proceedings were so commenced." This section, when read in connection with section 17 of Chapter 141, has application only to a situation where proceedings had been

commenced but had not culminated in a contract or agreement prior to June 30, 1937.

Plaintiff further contends that Chapter 141 has been repealed by Chapter 126 of the Laws of 1939. Chapter 141 defines "undertaking" as follows: "Section 2. * * * (a) The term 'Undertaking' shall mean any one or a combination of the following: water, *natural gas, sewerage or central heating plants and systems,* together with all parts thereof and appurtenances thereto including, but not limited to, supply and distribution systems, reservoirs, dams, sewage treatment and disposal works." Chapter 126 in defining "undertaking" omitted the italicized portions above; however, that it did not affect the powers of the municipality under Chapter 141 is made apparent from section 3, which, in defining the powers of the municipality, starts out by saying: "In addition to the powers which it may now have, any municipality shall have power under this Act," etc. Also section 13 of Chapter 126 provides: "The powers conferred in this Act shall be in addition and supplemental to the powers conferred by any other general, special or local law." Thus, Chapter 126 was intended to confer greater powers on municipalities and not to take away any powers which they already had.

Chapter 141, not having been repealed, furnishes authority for the issuance of revenue bonds without submitting the question to a vote of the people if its provisions have otherwise been complied with.

The next contention of plaintiff is that Chapter 141 in effect expired by its own terms on June 30, 1937, and furnishes no authority for the issuance of bonds thereafter. It relies on section 17 of the Act, reading: "Except in pursuance to any contract or agreement theretofore entered into by any municipality, no municipality shall borrow any money or deliver any bonds pursuant to this Act to the purchaser or purchasers thereof after June 30, 1937."

Defendants take the view that a contract or agreement was entered into between the city and the United States prior to June 30, 1937, and, in consequence, that bonds may be issued

after that date. Plaintiff contends that no contract or agreement was consummated before June 30, 1937. This contention is grounded upon the fact that the offer of the United States government to make a grant and loan to the city contained this condition: "This offer is conditioned upon the applicant's submitting proof, prior to the payment by the United States of America for any obligations which it herein offers to purchase, that the system will have a supply of natural gas, proper and adequate as to quality, quantity and pressure, at a cost to the system which will permit resale at rates at least sufficient to provide for the operation and maintenance of the system and for the payment of interest on and principal of such obligation." It is conceded that this condition was not complied with before June 30, 1937.

In considering whether there was a contract or agreement within the meaning of section 17, prior to June 30, 1937, we must keep in mind the kind of contract or agreement which Chapter 141 contemplated. As used in section 17, the terms "contract or agreement" simply meant a meeting of the minds of the two parties—on the part of the city to go forward with the project, and on the part of the United States to finance it by a grant and loan. That section did not contemplate that all of the conditions should first be performed before it could be said that there was a contract or agreement. It was sufficient that there be an agreement to perform the conditions prescribed. The offer of the United States government containing the condition above quoted was accompanied by a letter from the Assistant Administrator, calling for immediate acceptance in the following language: "You are further advised, that in case it is possible to covenant as above, the offer should be accepted not later than ten days from the date of its receipt." That letter also stated: "If for any reason it is impossible to comply with this requirement, the offer should not be accepted but should be returned immediately to the State Director with a statement of the reasons therefor." The offer was accepted on December 7, 1936, by resolution of the city council. Hence it is plain that the United States through its officers intended

that its offer should be accepted or rejected before the conditions specified should be complied with or performed. The acceptance of the offer constituted an agreement on the part of the city that it would comply and perform the conditions imposed. The fact that the United States has from time to time extended the time within which the city might comply with the conditions does not alter our conclusion that there existed a contract or agreement prior to June 30, 1937, within the contemplation of section 17 of the Act.

It is contended by plaintiff that the United States need not purchase the bonds, because there has been no meeting of the minds on what is an adequate supply of gas. It may be that the city would have no remedy to compel the United States to purchase the bonds if, before the money changed hands, the United States indicated a change of purpose. But that situation would probably obtain even though the United States declined to purchase the bonds without giving any reason therefor. That circumstance does not militate against the claim that there was a contract or agreement between the parties.

The court was correct in holding, as it did, that there was a contract or agreement existing prior to June 30, 1937, within the meaning of section 17.

It is suggested by plaintiff that section 5060, Revised Codes, ▆ prohibits the sale of the bonds. That section reads: "No ordinance or resolution passed by the council of any city or town shall become effective until thirty days after its passage, except general appropriation ordinances providing for the ordinary and current expenses of the city or town, excepting also emergency measures, and in the case of emergency measures the emergency must be expressed in the preamble or in the body of the measure, and the measure must receive a two-thirds vote of all the members elected. In emergency ordinances the resolutions shall include only such measures as are immediately necessary for the preservation of peace, health, and safety, and shall not include a franchise or license to a corporation or individual, nor any provisions for the sale of real estate, nor any lease or letting of any property for a period exceeding one year, nor the

purchase or sale of personal property exceeding five thousand dollars in value." This section is a general statute. Chapter 141 is a special statute, controlling as to the bonds in question here, unaffected by the general statute, by express provision of section 15 thereof.

Plaintiff contends that the contracts between Browne, Trustee, and the city are void because of the interest of C. O. Moore and Soderberg therein. Reliance is placed by it on section 5069, Revised Codes, which reads: "The mayor, or any member of the council, or any city or town officer, or any relative or employee thereof, must not be directly or indirectly interested in the profits of any contract entered into by the council while he is or was in office."

As to defendant Soderberg, it is sufficient to say that the court found that he had no interest in the contracts, and there is ample evidence in the record to support the finding. As to defendant Moore's interest, the court pointed out that in one of his letters he made a statement which would operate as an admission against him, but stated that he was not served with summons, and that there was no evidence that he had authority to bind any party to the action by extrajudicial admissions.

Whether the reason given by the court for overruling plaintiff's contention is sound, we need not determine. The only contract that plaintiff can question, so far as its right to avoid alleged unlawful competition is concerned, is the one between the city and the United States. It has no right or interest, because of its franchise, entitling it to question the contracts and acts of the city with others than the United States. It cannot, as the holder of a franchise, question the means and methods employed by the city by which the city is threatening it with competition, other than to question the direct authority of the city to proceed. (*Arkansas Louisiana Gas Co.* v. *City of Texarkana*, (5 Cir.) 100 Fed. (2d) 652; *Carolina Power & Light Co.* v. *South Carolina Public Ser. Authority*, (4 Cir.) 94 Fed. (2d) 520.)

If the contract between the city and Browne, Trustee, is void because of any interest of Moore therein, that would not

178

affect the contract between the city and the United States. It is the latter contract that plaintiff must defeat if it is to prevail ▇ on the issue of unlawful competition. Whether a taxpayer, as such, has the right to question the validity of contracts made by the city with an employee who is unlawfully interested in the contracts, notwithstanding no obligation is imposed on taxpayers by the contracts, we need not now determine. Before plaintiff could recover on that ground, the parties to the alleged illegal contract must both be before the court. That issue in the instant case could not be determined in the absence of Moore.

Plaintiff further contends that the contracts between the city ▇ and Catlett, Hobson and Smith, and between the city and McLaughlin, are void because there was not a compliance with section 5070, Revised Codes. That section reads: ''All contracts for work, or for supplies or material, for which must be paid a sum exceeding five hundred dollars ($500.00), must be let to the lowest responsible bidder, under such regulations as the council may prescribe; provided, that no contract shall be let extending over a period of three years, or more, without first submitting the question to a vote of the resident taxpayers of said city or town.''

As we have heretofore stated, Chapter 141 is the exclusive authority for the issuance of the revenue bonds here under consideration. It expressly provides in section 15 that ''the undertaking may be acquired, purchased, constructed, reconstructed, improved, bettered, and extended, and bonds may be issued under this Act for said purposes, notwithstanding that any general, special or local law may provide for the acquisition, purchase, construction, reconstruction, improvement, betterment, and extension of a like undertaking, or the issuance of bonds for like purposes, and without regard to the requirements, restrictions, limitations or other provisions contained in any other general, special or local law, including, but not limited to, any requirement for the approval by the voters of any municipality. Insofar as the provisions of this Act are inconsistent with the

provisions of any other general, special, or local law, the provisions of this Act shall be controlling."

Chapter 141 is a special statute, giving to the city, acting through its governing body, the authority to do everything necessary to acquire a gas distribution system and an adequate supply of gas, and this it may do without complying with the provisions of section 5070. If this were not so, then the broad provisions of Chapter 141 purporting to give the municipal authorities power to construct a municipal gas project, could be frustrated by the qualified electors declining to authorize the purchase of gas. This was not the legislative intent. The acquisition of a supply of gas is so interwoven with the project as a whole that authority on the part of the governing body of the city to construct the system without a vote of the people carries with it the right to contract for a supply of gas without such vote.

The next contention of plaintiff is that the city by the proposed contract is assuming obligations without submitting the proposal to a vote of the resident taxpayers. Here again reliance is placed on section 5070, but the complete answer to the contention is that Chapter 141, and not section 5070, controls here. By Chapter 141 it is provided: "No holder or holders of any bonds issued under this Act shall ever have the right to compel any exercise of taxing power of the municipality to pay said bonds or the interest thereon." Section 9 of that chapter also provides: "Each bond issued under this Act shall recite in substance that said bond, including interest thereon, is payable from the revenue pledged to the payment thereof, and that said bond does not constitute a debt of the municipality within the meaning of any constitutional or statutory limitation." Chapter 141 imposes no obligation on taxpayers as such. That chapter, so far as undertakings are launched under its authority, supersedes other general provisions. As before noted, consent of the taxpayers is not contemplated under that chapter before the undertakings there provided for may be accomplished.

The wisdom or necessity of eliminating, with reference to the projects contemplated by Chapter 141, all the safeguards provided in the public interest by general statutory requirements for competitive bids and for approval by the voters, is solely for the legislature to determine, and with its determination this court cannot interfere.

The district court properly entered judgment for defendants. The judgment is affirmed.

Mr. Chief Justice Johnson, Mr. Justice Erickson, Honorable Ralph L. Arnold, District Judge, sitting in place of Mr. Justice Morris, disqualified, and Honorable Stewart Mc-Conochie, District Judge, sitting in place of Mr. Justice Stewart, disqualified, concur.

Rehearing denied October 14, 1939.