648

PUBLIC SERVICE COMPANY OF INDI-
ANA, Inc., Plaintiff-Appellee,

v.

David A. HAMIL, Administrator of the
Rural Electrification Administration,
and Clifford M. Hardin, Secretary of
Agriculture, Defendants-Appellants.

SOUTHERN INDIANA GAS & ELEC-
TRIC CO., Plaintiff-Appellee,

v.

David A. HAMIL, Administrator of the
Rural Electrification Administration,
and Clifford M. Hardin, Secretary of
Agriculture, Defendants-Appellants.

Nos. 17547, 17548.

United States Court of Appeals
Seventh Circuit.

Sept. 18, 1969.

Certiorari Denied Jan. 12, 1970.
See 90 S.Ct. 571.

Alan S. Rosenthal, Tax Div., Dept. of Justice, Washington, D. C., K. Edwin Applegate, U. S. Atty., Indianapolis, Ind.,

Carl Eardley, Acting Asst. Atty. Gen., Reed Johnston, Jr., Atty., Dept. of Justice, Washington, D. C., for defendants-appellants.

Alan W. Boyd, Indianapolis, Ind., Charles W. Campbell, Plainfield, Ind., Fred P. Bamberger, Evansville, Ind., G. R. Redding, Indianapolis, Ind., for plaintiff-appellee.

Before KILEY and FAIRCHILD, Circuit Judges, and WISE, District Judge.*

KILEY, Circuit Judge.

This is an appeal under 28 U.S.C. § 1292(a) by defendants Administrator and Secretary, jointly referred to herein as Administrator, from a preliminary injunction issued by the district court restraining Administrator from operating a multimillion dollar generating and transmission power station in Indiana constructed with funds loaned by the Administrator by virtue of Section 4 of the Rural Electrification Act (REA), 7 U.S.C. § 901 *et seq.* We reverse.

There is no challenge to the district court's findings of fact: For many years plaintiff Public Service Company of Indiana has sold electric energy for resale to fifteen Rural Electric Membership Corporation cooperatives (REMC) by virtue of authority from the Indiana Public Service Commission. Plaintiff Southern Indiana Gas & Electric Co. has served the city of Jasper and several cooperatives for many years. Both companies have invested millions in plant and facilities.

On June 15, 1961 the Administrator preceding the named administrator here made an agreement with Hoosier Cooperative Energy, Inc. to lend it not more than $60,225,000 to construct an electric generating plant and transmission facility. They were purporting to act under the authority of the REA.

The agreement was aimed at furnishing wholesale electric power to Hoosier's sixteen distribution cooperative members for resale by them,[1] with funds loaned by the REA. Hoosier, under Section 4,[2] filed an application before the Indiana Public Service Commission for authority to borrow the funds and to build and operate the facility. Plaintiffs, private power companies holding certificates of convenience and necessity from the Indiana Public Service Commission, opposed the application on the ground that public convenience and necessity was not served by introducing competition where the private companies had legal monopolies.

Hoosier withdrew its application on April 25, 1962. The Administrator and Hoosier on March 30, 1962 transferred the loan commitment to Indiana Statewide Electric Cooperative, Inc., which had been incorporated in 1935 with approval of the Indiana Public Service

---

* Judge Wise is sitting by designation from the Eastern District of Illinois.

1. Two REMCs now purchase power from Southern Indiana.

2. The Administrator is authorized and empowered, from the sums hereinbefore authorized, to make loans for rural electrification to persons, corporations, States, Territories, and subdivisions and agencies thereof, municipalities, peoples' utility districts and cooperative, nonprofit, or limited-dividend associations, organized under the laws of any State or Territory of the United States, for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons in rural areas who are not receiving central station service,

\* \* \* \* \*

*And provided further,* That no loan for the construction, operation, or enlargement of any generating plant shall be made unless the consent of the State authority having jurisdiction in the premises is first obtained. 7 U.S.C. § 904.

Commission to generate, transmit and sell electric power. The Administrator deleted from the contract the requirement of Section 4 that the consent of Indiana "first" be obtained.

Statewide then entered into long-term contracts with plaintiffs' utility customers effective when it was able to provide the electric power. These contracts required the customers to terminate contract arrangements with plaintiffs as soon as legally possible and to rely thereafter upon Statewide as their source of electrical power. On May 14, 1962 Statewide broke ground for construction of the generating facilities, whereupon Southern Indiana filed suit in the Circuit Court of Hancock County, Indiana. The suit challenged the right of Statewide, under its contract with defendant, to build and operate the facilities without authority from the Indiana Public Service Commission.

The Indiana Circuit Court, on January 11, 1965, denied relief for the plaintiffs. An appeal to the Appellate Court of Indiana resulted in three judges voting to affirm, three to reverse and two not participating. Southern Ind. Gas & Elec. Co. v. Indiana Statewide Rural Electric Coop., Inc., 232 N.E.2d 899 (Ind. App.1968). On appeal, the Indiana Supreme Court on December 10, 1968 reversed the circuit court judgment by a three to two vote. 242 N.E.2d 361 (Ind. 1968). The court found that the rights claimed by Statewide in the 1935 hearings and proceedings had lapsed for nonuser. Presumably this means they had lapsed by the time of the transfer of the loan commitment from Hoosier to State-

wide. The Indiana Supreme Court directed the circuit court to enter an order enjoining Statewide from generating or transmitting electricity "until it obtains a current 'certificate of convenience and necessity' from the Public Service Commission of Indiana."

On December 28, 1968,[3] defendants, after learning of that decision, took title to Statewide's interest in the plant and facilities under Section 7 [4] of the Act. Under this basic agreement title was to revert to Statewide in four and a half years if it could obtain the necessary authority to operate the generating and transmission system. Under this agreement Statewide was constituted as agent for the United States to complete construction and to operate the plant and system under the direction and control of the Administrator. The transfer from Statewide carried all contracts for servicing the REMCs. Among the contracts transferred to the Administrator was that between Statewide and the city of Jasper, Indiana. On February 28, 1969, Jasper discontinued purchasing energy from Southern Indiana which had permission to serve Jasper, among other REMCs.

Southern Indiana and Public Service Co. filed, on January 24, 1969, and February 14, 1969, respectively, the petitions before us. The causes were consolidated for hearing on the motions for injunction.[5] The preliminary injunction on appeal followed.

The district court's conclusions of law from the facts are that it had jurisdiction; that plaintiffs made the necessary proof for issuance of the prelim-

3. No funds had been advanced under the loan until after the circuit court decision January 11, 1965. In October, 1968 the loan was increased to $100,430,000.

4. The Administrator is authorized and empowered to bid for and purchase at any foreclosure or other sale, or otherwise to acquire, property pledged or mortgaged to secure any loan made pursuant to this chapter; to pay the purchase price and any costs and expenses incurred in connection therewith from the sums authorized in section 903 of this title; to accept title to any property so purchased or acquired in the name of the United

States of America; to operate or lease such property for such period as may be deemed necessary or advisable to protect the investment therein, but not to exceed five years after the acquisition thereof; and to sell such property so purchased or acquired, upon such terms and for such consideration as the Administrator shall determine to be reasonable. 7 U.S.C. § 907.

5. Joined also in the hearings were applications of several Indiana property owners requesting modification of the district court's February 3, 1969 ex parte order for delivery of possession ordered in the

inary injunction; that Administrator had, and Statewide had not, authority to operate or to make contracts for service with plaintiffs' customers; that the loan made by the Administrator violated Section 4 of the Act by failing to meet the "absolute legal requirement" of consent by the Indiana Commission; that since the loan was not made "pursuant" to the Act through failure to obtain consent, Section 7 confers no power to operate in competition with plaintiffs; that the United States was not a necessary and indispensable party requiring its consent to be sued; and that there is no adequate legal remedy available to plaintiffs, who have standing to maintain the actions "to prevent the unlawful competition for their customers or displacement of their services" unless the Indiana Commission gives authority for that purpose.

The injunction issued restraining defendants from "generating, transmitting, furnishing or selling electricity, * * * within the State of Indiana and particularly the areas and customers serviced * * * by plaintiff * * *" until the court's further order. The court ordered the injunction conditioned on each plaintiff filing a million dollar bond.

The Administrator makes three contentions challenging the injunction: (1) the district court lacked jurisdiction for want of standing of plaintiffs; (2) the district court lacked jurisdiction for lack of consent by the United States to be sued; and (3) the district court erred in concluding that the loan was unlawful and abused its discretion in granting the injunction.

### I—JURISDICTION

■ We think that the certificates of convenience and necessity held by the plaintiffs gave them the right to be free from competition with similar utilities not having these certificates. These rights were property as shown by the large investments and the income produced by the exercise of these rights. Frost v. Corporation Comm. of Oklahoma, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929). A threatened invasion by a competitor not having a certificate of convenience and necessity is an injury to property which courts are not powerless to redress. This is not to say that courts have jurisdiction to review the mere granting of a loan by the Administrator. We hold only that upon this record the district court had equity jurisdiction to enjoin a substantial threat to substantial property rights where there is no adequate remedy at law. Frost v. Corporation Comm., 278 U.S. 515, 520–521, 49 S.Ct. 235 (1929).

■ We hold also that the district court did not err in concluding that plaintiffs' suits were not against the United States so as to require its consent. The suits are based on an alleged unauthorized loan contract made by the Administrator and seek to restrain his conduct based on the loan contract. Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). The appropriate equitable relief would be against the Administrator in the district court and a judgment by that court would not be *res judicata* against the United States.

### II—STANDING

■ Since the district court had power to entertain plaintiffs' suits and because plaintiffs have valuable property rights affected by the conduct of Administrator, it follows the plaintiffs have standing. The decision in Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), does not compel a different conclusion. There the private utility sought to restrain defendant administrator from making loans under the National Industrial Recovery Act to municipalities empowered by Alabama to generate and distribute electric power. The district court had found standing but dismissed on other grounds. The court of appeals affirmed the dismissal, but on the ground that plaintiff

United States eminent domain action to condemn property for the generating and transmitting station in suit. The orders were vacated. The Administrator has not appealed the vacating orders.

had no standing to challenge the granting of the loan. The Supreme Court agreed with the court of appeals that there was no legal or equitable right of the plaintiff which had been invaded. "[T]he mere fact that petitioner will sustain financial loss by reason of the *lawful* competition" gave plaintiff no sufficient interest to maintain the suit. *Id.* at 478, 58 S.Ct. at 303. (Emphasis added.) The Court also said plaintiff's claim was "in principle, as though an unauthorized loan were about to be made to enable the borrower to purchase a piece of property in respect of which he had a right, equally with a prospective complainant, to become the buyer." *Id.* at 480, 58 S.Ct. at 304.

We would agree that under the illustrations given in Alabama Power, *supra,* at 480–481, 58 S.Ct. 300, if plaintiffs here had no property right and were "strangers" they would have no standing to challenge the loan even though unauthorized, or to challenge its use if Statewide's use was not allegedly unlawful. But that is not our case. Our case is in principle similar to Frost v. Corporation Comm., 278 U.S. 515, 49 S.Ct. 235 (1929), which the Supreme Court in *Alabama Power* distinguished from the case before it. Alabama Power Co. v. Ickes, *supra,* at 484, 58 S.Ct. 300. What the Supreme Court said in *Alabama Power* distinguishing it from *Frost* applies here as well: "For the competition contemplated there was unlawful while that of [plaintiffs here] is entirely lawful." Alabama Power v. Ickes, *supra,* at 485, 58 S.Ct. at 306.

The decision in Rural Electrification Administration v. Central Louisiana Elec. Co., 354 F.2d 859 (5th Cir. 1966), is not pertinent. There the private utilities had no certificate from the state granting exclusive authority in the territory involved. Here plaintiffs have exclusive authority from the Indiana Commission with respect to competition from others having no such authority from the state. There the case raised nothing more than "mere economic competition made pos-

sible by government action." Here plaintiffs have property rights which the district court found were threatened with invasion by the Administrator's unlawful competition. There the court did not pass on the question of whether the loan violated Section 4 of the Act since Louisiana's consent had not been obtained. Here the district court found consent was essential to justify the Administrator's acquisition under Section 7 and that consent had not been obtained.

We hold that the district court did not err in concluding that plaintiffs had standing.

## III—THE MERITS

The vital legal question before us is whether the district court erred in deciding that, by making the loan to Statewide without "first" obtaining Indiana's consent, as required by Section 4 of the Act, the Administrator has no authority under Section 7 to operate the generating and distribution system since the loan was not made "pursuant to" Section 4 as Section 7 requires.[6]

We agree with plaintiffs that the Indiana Supreme Court decision did not decide that Statewide once had the authority but that such authority had lapsed for non-user. However we note that Statewide's corporate charter in 1935 empowered it to generate and distribute electric power and we have not been referred to any Indiana statute which requires use within any specific period, and that presumably the charter power has not been challenged at any time before plaintiffs' suit in the Indiana Circuit Court.

We begin with the premise that when the loan contract was assigned to Statewide it had no power to operate the electric power system, and that in making the loan to Statewide the Administrator had not "first" obtained consent of Indiana.

Plaintiffs argue that the Administrator's loan was made to Statewide in violation of the "specific unequivocal prohibition of Congress" ; that it could not

6. There is no question raised as to the validity of the "takeover" of the project. Only its operation by the Administrator is under challenge.

be made without having consent of the Indiana Power Commission since the Indiana Supreme Court decided Statewide had no authority to operate; that the Administrator has no greater right than Statewide; and that Congress could not have intended that the Administrator could exceed his authority under Section 4 and under Section 7—under claim of protecting the security for the loan—by operating the system in competition with plaintiffs without having consent of Indiana. They argue also that the words "pursuant to" the Act cannot be construed to mean, as they say the Administrator asserts, "any loan claimed by the Administrator to have been made." They rely upon School District v. Stone, 106 U.S. 183, 187, 1 S.Ct. 84, 27 L.Ed. 90 (1882), where the Court stated that recitals in municipal bonds that the bonds were issued "in conformity with" or "in pursuance of" the statute authorizing the issuance should not preclude inquiry into whether the statutory considerations precedent were performed.

That statement in *Stone* does not compel us to hold that the loans here were not made "in pursuance of" Section 4. The five year limitation on the Administrator's power given in Section 7, and reason, preclude application of the *Stone* statement. We are not disposed to attribute to Congress the intention of sacrificing the protection of security for the loans for a limited period because of the improvidence of the Administrator in making the loans. We do not agree that the Administrator had no greater right than Statewide to operate the plant facilities. We could agree if there were no express limitations in Section 7 clearly intending the grant of an interim power to operate and if there was an attempt to establish the Administrator in the permanent business of competing with plaintiffs without consent of Indiana.

But that is not the case before us. We have here an admittedly valid takeover by the Administrator with power to operate for not to exceed five years during which Statewide may obtain Indiana's consent to operate the system and gain reversion of title. We cannot see merit in the plaintiffs' contention—in view of the express power given to the Administrator to operate the security to protect the government loan—that the Administrator's power to operate for five years is lost because of Statewide's lack of authority to operate indefinitely.

We are not persuaded that the Administrator proceeded "in direct disregard and plain violation," as plaintiffs assert, of the requirement of Section 4 for obtaining state consent, if that term is meant to attribute invidious intentional and arbitrary action to the Administrator. We think that it is arguable that when the assignment was made to Statewide the Administrator saw apparent authority in Statewide and that his deletion from the loan contract of the necessity of Statewide getting Indiana authority, which on appearance it already possessed, was consistent. We point out that the three to two vote of the Indiana Supreme Court is evidence that the Administrator was not arbitrary.[7]

We think it is clear that "pursuant to the Act," Section 7 means only that the Administrator make loans limited to the purpose of meeting needs of rural electrification and does not mean that the loans be prudently made or even made in strict unerring compliance with every provision of Section 4 of the Act. In our opinion Congress intended that the Administrator was not to operate a public utility business in competition with Indiana state franchised utilities but was to operate a security temporarily and only for the purpose of protecting that security for the loan which turned out to

7. Judges DeBruiler and Hunter dissented on the grounds that Statewide was given the necessary power in 1935 and had not lost it by non-user and that the Indiana Commission was without power to grant a certificate of convenience and necessity because the Commission's power over Statewide organized under the Indiana REMC Act was limited to approving or disapproving articles of incorporation under which Statewide could own and operate the facility.

have been improvidently made until the borrower has authority to operate or the Administrator to sell or lease the security. We base this judgment on the Congressional reports recommending passage of the Bill [8] and the five year limitation included in the Act limiting the Administrator's power to operate. The limited grant of power we think was intended to enable the Administrator to conduct a salvage operation when a loan turns sour, and to be used in circumstances here to keep the security from undue loss or deterioration until the operation can be turned over to someone having state authority to operate under lease or after sale. The intention was to enable the government through the Administrator to make the best of a bad bargain. Congress could not have intended that after a predecessor administrator made a loan under Section 4 which proved to be imprudent, his successor must be "stuck," so to speak, with an idle $63,-000,000 generating plant and transmission system, bereft of authority to prevent deterioration, and be forced to sell or lease under pressure of taking what he can glean from a wise purchaser or lessee operator so as to avoid being forced later to take less.

■ We hold that the district court was in error in restraining the Administrator from "generating, transmitting, furnishing or selling electricity * * * within the State of Indiana and particularly the areas and customers serviced * * * by plaintiffs," after the Administrator's admittedly lawful takeover and during the five year period provided in Section 7, or until he turns it over to a borrower with authority to operate the plant and system. This court's decision in Welton v. 40 East Oak Street Bldg. Corp., 70 F.2d 377 (7th Cir. 1934), involving corporate defendant proceeding illegally to construct a building in violation of a Chicago zoning ordinance, does not compel a different conclusion; nor does the decision in Western Colorado Power Co. v. Public Utilities Commission, 159 Colo. 262, 411 P.2d 785 (1966), which decided that an REA borrower must have a state certificate of convenience and necessity.

For the reasons given, the district court judgment issuing a preliminary injunction is reversed.

8. "Mr. Rayburn. May I say to the gentlemen that we are not in this bill, intending to go out and compete with anybody. By this bill, we hope to bring electrification to people who do not now have it. The bill was not written on the theory that we are going to punish somebody or parallel their lines or enter into competition with them. * * *." (80 Cong. Rec. p. 5283)

"Mr. Moran. * * *

"Considerable criticism has been leveled at the plan on the grounds of supposed injury to present operating private utility companies. This criticism is unwarranted. REA lines will not compete with existing facilties. In fact, construction of lines by cooperative associations will be to the advantage of the utility companies. With probably very few exceptions, power will be purchased from present generating plants, increasing the revenues of the utilties." (80 Cong.Rec. p. 5295).

"Mr. Fletcher. * * * (80 Cong. Rec. p. 5304).

"But what is the other side of this question? What are the objections to the bill?

"So far I have not learned of any person having appeared to disapprove of the main purpose of this bill. The closest to disapproval has been a short statement made by an official of a big business organization objecting to what he felt might eventually develop into competition with private enterprise.

"As I have shown, this program does not contemplate nor permit competition with existing public utilities and the ultimate cost will be infinitesimal in comparison with the great benefits conferred." (80 Cong.Rec. p. 5307).

"In short the whole purpose of the rural electrification program, present and proposed, is to develop, not the electric service that the private industry has cultivated, but which lies just beyond, and which the private industry has scorned as not immediately and alluringly profitable. There is no desire to provide loans either where service exists or where, legitimately and in truth, the power companies are about to provide service." (80 Cong. Rec. p. 5308).