Mr. W. H. Metson, of San Francisco, Cal., for petitioner.

Petition for writ of certiorari to the United States Circuit Court of Appeals for the Ninth Circuit denied.

**UNITED STATES v. ROGGE** et al.

No. 4795.

District Court of Alaska. Fourth Division. Fairbanks.

Oct. 22, 1941.

132

134

138

Ralph J. Rivers, U. S. Atty., of Fairbanks, for plaintiff.

George W. Folta, Counsel at Large in Alaska, of Juneau, for Department of Interior.

John L. McGinn, of Fairbanks, for defendants.

PRATT, District Judge.

I. This cause was submitted upon the following agreed statement of facts:

"Whereas, an actual controversy exists between the above named parties arising out of the attempt of the United States to collect tolls on freight transported over the Richardson Highway under regulations promulgated by the Secretary of the Interior, which the defendants contend are invalid, and

"Whereas, disputes and breaches of the peace have occurred, and payment of the tolls has been frequently refused and avoided, and

"Whereas, the plaintiff seeks to recover tolls, payment of which has been so refused or avoided, and the defendants resist said effort and seek to test the validity of said regulations,

"Now, Therefore, for the purpose of submitting the aforesaid controversy to the above entitled Court upon an agreed·statement of facts and securing an adjudication of their respective rights, the parties hereto hereby stipulate as follows:

"1. That the highway extending from Valdez on the southern coast of Alaska for a distance of approximately 371 miles to Fairbanks, now known as the Richardson Highway, was established on the public domain in the year 1903, and was then known as the Richardson Trail; That in 1906, in pursuance of the Act of Congress of Jan. 27, 1905, 33 Stat. 616, 48 U.S.C.A. § 321 et seq., as amended, the United States improved and constructed, has ever since maintained, and does now maintain substantially over the same route a public highway, including a ferry at McCarty, 280 miles north of Valdez for the carriage of traffic across the Tanana River, the cost of maintaining said highway being borne by annual Congressional appropriations for the construction and maintenance of roads, bridges, ferries, trails, tramways, and aviation fields in the Territory of Alaska, as augmented by 65% of the Alaska Fund which

is derived from occupation and trade licenses outside of incorporated towns in the Territory of Alaska; That since the creation of said road it has been a free public highway except as hereinafter set forth;

"2. That by Act of Congress of June 30, 1932, 47 Stat. 446, 48 U.S.C.A. § 321a et seq., it was provided that:

" 'The Secretary of the Interior shall execute or cause to be executed all laws pertaining to the construction and maintenance of roads and trails and other works in Alaska, heretofore administered by said board of road commissioners under the direction of the Secretary of War; and all appropriations heretofore made, and now available, or that hereafter may be made, for expenditure by said board for meeting the cost of such work in the Territory of Alaska, are hereby transferred to the Secretary of the Interior, to be thereafter administered in accordance with the provisions of this section and sections 321a, 321c and 321d of this title; and the said board is directed to turn over to the Secretary of the Interior all equipment, materials, supplies, papers, maps, and documents, or other property utilized in the exercise of such powers, for the use of the said Secretary in the administration of the construction and maintenance of roads, tramways, ferries, bridges, and trails, and other works in the Territory of Alaska, heretofore administered by said board.'

" 'With the approval of the President, the Secretary of the Interior shall have power, by order or regulation, to distribute the duties and authority transferred, and appropriations pertaining thereto, as he may deem proper to accomplish a more economical and effective organization thereof, and to make rules and regulations governing the use of roads, trails, and other works, including the fixing and collection of tolls where deemed necessary and advisable in the public interest.'

" 'All estimates of appropriations for the construction and maintenance of roads and trails and other works, as submitted prior to June 30, 1932, by the Secretary of War,

shall after such date be submitted by the Secretary of the Interior.'

in pursuance whereof the Secretary of the Interior assumed jurisdiction over the aforesaid highway and has ever since exercised, and does now exercise, the jurisdiction vested in him by the Act aforesaid;

"3. That, pursuant to his interpretation of said Act, the Secretary of the Interior made and promulgated the following regulations:

" 'Tolls: For transportation of merchandise or freight over the Richardson Highway; there shall be charged and collected at or adjacent to the McCarty Ferry on the Tanana River, tolls equal to two and one-half (2½) cents per ton of such merchandise or freight passing that point multiplied by the number of miles such merchandise or freight has been or is being carried over the said highway; No vehicle hauling such merchandise or freight shall be allowed to pass the designated toll station except upon payment of the tolls as herein provided. It shall be the duty of the Governor of Alaska, as ex-officio Commissioner for the Interior Department, to cause the collection of the tolls to be made in such manner as may be found most convenient and practicable, and all moneys so collected shall be deposited in the Treasury of the United States as miscellaneous receipts.

" 'The usual ferry charges are not affected by these regulations.'

and has ever since collected at the ferry aforesaid the tolls so fixed on such freight only as passed to the northward or southward thereof; except in such instances as the payment thereof has been refused or avoided;

"4. That ever since 1906 the plaintiff has operated in connection with the Richardson Highway, and as a part thereof, a ferry where said highway crosses the Tanana River, which said ferry is known as the McCarty Ferry;

"That the distance from Valdez to said ferry is approximately 280 miles, and the distance from said ferry to Fairbanks is approximately 91 miles;

"That ever since the year 1935, the Secretary of the Interior, acting by and through the Governor of Alaska, and the Board of Road Commissioners, has maintained a toll station on the east side of said road, at about 100 feet south of the Tanana River, where the same is crossed by said ferry; That said toll station is in charge of toll collectors in the employ of the Alaska Road Commission, an agency of the Department of the Interior;

"That on or about the 30th day of July, 1941, the Secretary of the Interior by regulation designated Shaw Creek as a check station for the purpose of requiring trucks to submit evidence of payment of tolls at McCarty Ferry;

"That a gate or barrier has been constructed, and is now being maintained at a point about twelve (12) miles north of said ferry, at Shaw Creek, and no vehicle going north containing freight or merchandise is permitted to go through said toll gate unless a receipt is produced, showing that the toll on the freight and merchandise being transported therein has been paid at the toll station; That upon all freight and merchandise transported on and over said Richardson Highway which does not pass the aforesaid toll station, no toll is required or compelled to be paid, nor are any passenger buses, automobiles, or other vehicles not transporting freight or merchandise compelled to pay toll, even though they pass by said toll station; That only such persons engaged in transporting freight or merchandise over said highway are compelled to pay the toll who pass by said toll station, and the toll imposed upon the freight and merchandise which passes said toll station is equal to two and one-half (2½) cents per ton of such merchandise or freight, multiplied by the number of miles said merchandise or freight has been or is being carried over said highway; That in addition, there is a ferry charge of one dollar ($1.00) collected for every vehicle transported by said ferry, which has been imposed and collected since 1906;

"5. That the defendants and each of them are engaged principally in transporting, for hire, from Valdez to Fair-

banks, Alaska, freight and merchandise which is shipped from Seattle, Washington, or points in Alaska, to Valdez and consigned to the miners and merchants of Fairbanks and vicinity;

"6. That under and by virtue of an Act of Congress entitled: 'An act to authorize the President of the United States to locate, construct, and operate railroads in the Territory of Alaska. and for other purposes', approved March 12, 1914, 38 Stat. 305, 48 U.S.C.A. § 301, the United States has constructed, maintained, and operated, and does now maintain and operate a railroad from the tidewater to interior Alaska; That the southern terminus of said road is at Seward, Alaska, situated on Resurrection Bay, which is an open Pacific Ocean harbor on the southern coast of Alaska, and the northern terminus of said road is at Fairbanks, Alaska, which is situated on Chena Slough, a tributary of the Tanana River, a tributary of the Yukon River, which, together, form the main navigable waters of Interior Alaska; That the town of Fairbanks is the metropolis of interior Alaska, and is the principal supply and shipping point for the towns and settlements of interior Alaska;

"That the purpose and object in constructing and maintaining said railroad, as set forth in said Act, was and is: 'To aid in the development of the agricultural and mineral or other resources of Alaska, and the settlement of the public lands therein, and so as to provide transportation of coal for the Army and Navy, transportation of troops, arms, munitions of war, and mail, and for other governmental and public purposes, and for the transportation of passengers and property';

"That the Richardson Highway runs parallel to said railroad, and is open for the transportation of freight and merchandise only during the months of June, July, August, and September; That said highway also offers transportation from tidewater to interior Alaska, its southern terminus being at Valdez, situated on Prince William Sound, and its northern terminus at Fairbanks, Alaska; That said

highway is in direct competition with the Railroad for ocean bound and other freight and merchandise shipped from the States and other parts of Alaska to Fairbanks and other settlements in interior Alaska;

"That the practical effect of said regulations hereinabove set forth imposing a toll upon all freight and merchandise carried over said highway, as aforesaid, is to substantially eliminate competition over said highway with the railroad as to freight and merchandise transported beyond the Tanana River and to the north thereof;

"7. That if the aforesaid regulation imposing the tolls in question is valid it is agreed for the purpose of this stipulation that there is now due and owing, respectively, by the defendants named, to the United States on freight transported over said highway, tolls in the amounts set opposite their names, as follows:

| | |
|---|---|
| William and Max Miller | $713.60 |
| Lawrence and Eugene Rogge | 710.54 |
| Alfred Ghezzi, Jr. | 974.00 |
| Byron Glen Roberts | 430.90 |
| Richard Zehnder | 494.64 |
| Mort Cass | 157.02 |
| Clyde Gordon | 145.70 |

for which plaintiff may have several and joint judgments against the co-partnerships, and several judgments against the other defendants, together with costs and disbursements;

"8. It is further stipulated and agreed that this stipulation be filed with the Clerk of the above entitled Court for the purpose of submitting this controversy to said Court under the provisions of Sections 3688–3690, inclusive, Compiled Laws of Alaska 1933, and that no party hereto waives the right to appeal from any judgment that may be entered in this case.

"Dated at Fairbanks, Alaska, this 15th day of August, 1941. * * *"

II. (a) As the general public used the highway in question from 1903 to 1906 before the public authorities took charge of the road, the defendants maintain that a right of way for a free highway vested in the public under section 2477, R.S.U.S., § 932, Title 43, U.S.C.A., and that the United States took this highway as trustee for the public.

The plaintiff denies that section 2477, R.S.U.S., § 932, Title 43, U.S.C.A., was in force in Alaska prior to 1912.

(b) The Revised Statutes of the United States of 1878 contain the following sections: Section 2477, granting rights of way over the public domain for highways; Section 1891, making the Constitution and laws of the United States not locally inapplicable extend to all territories then existing or thereafter to be created.

By an act approved May 17, 1884, 23 Stat. 24, entitled "An act providing a civil government for Alaska," Alaska became an organized territory. The Coquitlam v. United States, 163 U.S. 346, 347, 16 S.Ct. 1117, 41 L.Ed. 184; Binns v. United States, 194 U.S. 486, 24 S.Ct. 816, 48 L.Ed. 1087.

In the first part of section 8 of said last mentioned act, a land district and a United States land office for Alaska were created; the laws of the United States relating to mining claims "and the rights incident thereto * * * " were put in force; the owners of then existing mining claims were permitted to acquire patent thereto; the possession of Indians or other persons was not to be disturbed, but "the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: * * *."

The last sentence of said section was as follows: "But nothing contained in this act shall be construed to put in force in said district the general land laws of the United States."

Section 9 of said act provided for the appointment of a governor and other officers for Alaska; fixed their salaries and other necessary details and included the following:

" * * * and the laws of the United States, not locally inapplicable to said district and not inconsistent with the provisions of this act are hereby extended thereto; but there shall be no legislative assembly in said district, nor shall any Delegate be sent to Congress therefrom. * * * "

In "An act to repeal timber-culture laws, and for other purposes" (26 Stat. 1095), general provisions effective in the states were made and also special provisions for the location of townsites and trading sites in Alaska.

By an act approved May 14, 1898, 30 Stat. 409, Ch. 299, "the homestead land laws of the United States and the rights incident thereto * * * " upon surveyed or unsurveyed lands, were extended to Alaska. Rights of way to railroads in Alaska were granted. In section 3, relative thereto, we find the following wording: " * * * the location of such right of way * * * shall not cause the disuse of any tramway, wagon road, or other public highway now located therein, nor prevent the location * * * of any such * * * highway where such * * * highway may be necessary for the public accommodation; * * * "

In Section 6 of the act, provision is made for granting private individuals and companies rights of way to construct and operate toll roads, "subject to supervision and at rates to be approved by said Secretary * * * " (Secretary of the Interior). There also appears the following: "Provided, That if the proposed line of road in any case shall be located over any road or trail in common use for public travel, the Secretary of the Interior shall decline to grant such right of way, if, in his opinion, the interests of the public would be injuriously affected thereby. * * * "

Provisions for getting land for trading sites were again made and again land office districts were provided for.

By an act approved June 6, 1900, 31 Stat. 321, entitled, "An Act Making further provision for a civil government for Alaska, and for other purposes," a somewhat comprehensive code was set up, but it did not cover the subjects

of the creation of a land office, the homestead laws, townsite laws, the trading site laws, and numerous other subjects which had been dealt with in the acts of congress hereinbefore mentioned. It did copy in the statement from section 8 of the act of May 17, 1884, that "nothing contained in this act shall be construed to put in force in said district the general land laws of the United States." It did not repeat the portion of section 9 of said act of May 17, 1884, that "the laws of the United States, not locally inapplicable to said district and not inconsistent with the provisions of this act are hereby extended thereto; * * *."

(c) When Alaska became an organized territory in 1884, section 1891, R.S.U.S., immediately went into effect, making the laws of the United States which were not general land laws and which were not locally inapplicable, in force in Alaska. The statement to the same effect, which was contained in said act of May 17, 1884, merely constituted a repetition for clarity and convenience. The fact that the act of June 6, 1900, making further provision for the civil government of Alaska, did not repeat the substance of section 1891 was not significant, as it did not purport to be an act codifying all the laws of Alaska or covering all of the subjects theretofore covered in the act of May 17, 1884, and other acts.

"It will be presumed that the legislature, in enacting a statute, acted with full knowledge of existing statutes relating to the same subject; and where express terms of repeal are not used, the presumption is always against an intention to repeal an earlier statute, * * *." 59 C.J. 909.

"A code does not necessarily repeal a prior statute by implication, unless there is manifest repugnance between the two or the legislature intends the code to cover the whole subject and be a substitute for prior acts relating thereto." 59 C.J. 923.

"The doctrine that a statute is impliedly repealed by a subsequent statute, revising the whole subject matter of

the first, is restricted and does not apply to its full extent where the revisory statute declares what effect it is intended to have upon the former, as where it provides that it shall operate to repeal all inconsistent or repugnant acts; * * *." 59 C.J. 923.

■ The act of June 6, 1900, contained only a general repealing clause, repealing acts in conflict therewith (§ 368, 31 Stat. 552).

" * * * But an act or section relating to a particular subject is not repealed by its omission from a revising act which does not relate to, legislate on, or revise, that subject." 59 C.J. 923.

In Paszkowski v. Stony Brook Paper Co., 210 Mass. 86, 96 N.E. 129, the general law provided that if an employee was injured, the employer must be notified within sixty days of the injury in order to create a liability. In 1908 a statute was passed, making the owner of property upon which snow or ice had caused injury to anyone liable for damages if he was notified of the accident within ten days.

In codifying the laws in 1909, the act of 1908 was not included.

This was an action by an employee against his employer for damages caused by slipping on snow and ice.

Held: "But the statute not having been irreconcilable with existing laws before codification, it did not become repugnant when those laws were codified * * *." Plaintiff, having failed to give notice of the accident within ten days, could not maintain the action.

■ Consequently, the failure of the 1900 act to repeat the substance of section 1891, R.S.U.S., which was contained in the 1884 act, did not repeal that portion of the act of 1884 and did not prevent the provisions of section 1891, R.S.U.S., from continuing to operate in Alaska.

■ By an act approved August 24, 1912, 37 Stat. 512, congress provided for a legislature for Alaska and

defined its lawmaking powers. It contained also the provisions of section 1891, R.S.U.S. It did not repeat the proviso that the general land laws of the United States should not be in effect as had the acts of 1884 and 1900. However, as the act of 1912 merely purported to cover the subject of a legislature and did not cover anything else, its failure to repeat the statement that the general land laws of the United States should not apply had no significance.

■ (d) The laws of the United States which were not locally inapplicable and which were not general land laws were, therefore, in effect in Alaska in the years 1903 to 1906 and thereafter.

The question, then, is: "Was section 2477, R.S.U.S., 43 U.S.C.A. § 932, a general land law under the provisions of the act of May 17, 1884, such as not to be in effect in Alaska?"

■ Had it not been for the sentence "but nothing contained in this act shall be construed to put in force in said district the general land laws of the United States," all such laws which were not locally inapplicable would have been in force. The sentence, therefore, constituted an expression of an exception.

"Exceptions, as a general rule, should be strictly, but reasonably, construed; they extend only so far as their language fairly warrants, and all doubts should be resolved in favor of the general provision rather than the exception. * * *" 59 C.J. 1092.

■ Clearly, a right of way is not the land itself, though it is generally classified as an incorporeal hereditament. Section 2477 seems not to have been a general land law, but more of a law incident to the land laws.

In section 8 of the act of May 17, 1884, Congress made the laws of the United States relating to mining claims "and the rights incident thereto" in full force and effect in Alaska. The owner of a mining claim, under the mining laws of the United States, had a right, under section 2477,

incident to his mining claim for a right of way. The homestead laws "and the rights incident thereto" were put in force in Alaska by the act of May 14, 1898. Section 2477 gave homesteaders a right of way incident to their homestead. Thus, the very wording of the mining and homestead acts indicates that those acquiring title to mining claims and homesteads in Alaska had all rights incidental thereto which anyone in the states could have, which included a right of way when properly accepted.

That Congress considered section 2477, R.S.U.S., in effect is shown in the act approved May 14, 1898, wherein it mentioned that public highways now located should not be lost where railroads took rights of way under said act. Again in the same act it mentioned that the toll roads provided for in the act to be constructed by private individuals or corporations should not injuriously affect the public in its use of a road or trail in common use. If section 2477 was not in force, there was no possible way for there to have been public highways or roads in common use in Alaska at the time the act approved May 14, 1898, was enacted.

Again the purpose of congress must be considered. It was legislating so as to provide means of opening Alaska to a full and complete use thereof by the people of this nation. Miners, homesteaders, owners of trading sites, residents of townsites, prospectors, merchants, and everyone in Alaska required highways, and it is inconceivable that congress would withhold the use of the unappropriated public lands for that purpose by Alaskans, when such use had been accorded throughout all other territories and states of the United States.

The plaintiff's attorneys cite 30 Op. Atty. Gen., page 387, as sustaining their position. Some early land office decisions are mentioned therein which held that specific statutes did not by their own terms apply to Alaska. The opinion of the Attorney General held that revocable licenses for rights of way for telegraph lines, etc., over the public

domain, under the act of February 15, 1901, 31 Stat. 790, 43 U.S.C.A. § 959, and irrevocable easements for said rights of way, under the act of March 4, 1911, 36 Stat. 1253, 43 U.S.C.A. § 961, could be granted over public lands in Alaska.

Inasmuch as the provision that the general land laws should not be in effect in Alaska has at all times been the law of Alaska since 1884, § 8, act approved May 17, 1884; § 27, act approved June 6, 1900; § 95, C.L.A., 1913; § 292, C.L.A.1933; § 356, Title 48, U.S.C.A. The Attorney General's opinion is authority that section 2477 was in force during the period of 1903 to 1906.

The Land Office decision of February 5, 1908 (36 L.D. 264), holds that the act of congress, approved September 30, 1890, 26 Stat. 502, 43 U.S.C.A. § 729, granting to towns and cities the right to purchase land for cemeteries and park purposes, was applicable to Alaska, though not specifically extended thereto. It was there held:

"The primary object of the statute was not to enact a law for the disposal of public lands, but to grant to all incorporated towns and cities the right to appropriate for cemetery purposes public lands lying within three miles of such city or town. The grant being for a necessary public use must be liberally construed * * * and in the absence of express limitation, its provisions must be extended to all beneficiaries coming within the evident spirit and purpose of the act."

Under section 2477, R.S.U.S., rights of way may be procured by individuals or the public without any public record being made thereof. There is no procedure for the filing of applications, maps, etc., in the Land Office.

The general land laws of the United States require quite extensive applications, surveys, maps, and records of the proceedings to be kept.

"A federal statute grants the right of way for the construction of highways over public lands not reserved for public uses, and, upon acceptance by the duly authorized

public authorities or by the public, the public right becomes effective, * * *." 50 C.J. 962.

In Nicolas v. Grassle et al., 83 Colo. 536, 267 P. 196, 197, Nicolas and his grantor owned a farm separated from the county road by unappropriated public lands of the United States. The grantor and Nicolas crossed these public lands for several years. Afterwards, the public lands were taken up as a homestead, and an action was brought to enjoin the blocking of the road. It was held that section 2477 " ' * * * was an express dedication' and the use by those for whom it was necessary or convenient was an acceptance."

"A road may be a highway though it reaches but one property owner. * * * He has a right to access to other roads and the public has a right of access to him."

To the same effect is Leach v. Manhart, 102 Colo. 129, 77 P.2d 652.

See, also, Wilson v. Williams, 43 N.M. 173, 87 P.2d 683, where the use by the public was held sufficient acceptance of the offer made by section 2477, R.S.U.S.; Van Wanning v. Deeter, 78 Neb. 282, 110 N.W. 703; Greiner v. Board of County Com'rs of Park County, 64 Colo. 584, 173 P. 719, and Montgomery v. Somers, 50 Or. 259, 90 P. 674, wherein it was held that acceptance by the public without any record on the part of the officials is sufficient.

The rights of way contemplated in the Attorney General's opinion above mentioned and in 36 L.D. 264 above mentioned require applications, maps, and the granting of permits by the Secretary of the Interior, so that those acts came much nearer being within the general land laws of the United States than is section 2477, R.S.U.S.

Therefore, it appears that the provisions of section 2477, R.S.U.S., applied to Alaska in the period 1903 to 1906 and thereafter.

III. (a) Defendants urge that as this road was created prior to 1906 by the public, congress, as trustee for

the public, has stricter duties with respect to it than other roads inaugurated by public officials.

In 13 R.C.L., page 163, it is stated: "Subject to constitutional limitations, the state has absolute control of its public streets and highways, * * *."

"It is a police power." 13 R.C.L. 165.

. Article 4 of the Constitution of the United States provides, "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Section 3.

When congress provided for a legislative body in Alaska, it specially excluded from the legislature the right to legislate with reference to this and similarly situated highways. 37 Stat. 512, § 3; § 24, Title 48, U.S.C.A.; § 464, C.L.A. 1933.

In Binns v. United States, 194 U.S. 486, 24 S.Ct. 816, 817, 48 L.Ed. 1087, it is stated: "It must be remembered that Congress, in the government of the territories as well as of the District of Columbia, has plenary power, save as controlled by the provisions of the Constitution. * * * It may legislate directly in respect to the local affairs of a territory, or transfer the power of such legislation to a legislature elected by the citizens of the territory. * * *"

There seems to be no reason or authorities for making the distinction above mentioned in regard to this highway.

▮▮▮ (b) That congress may change free roads into toll roads or delegate that authority with reference to roads in the Territory of Alaska is established by many authorities. See the case of Gordon v. Nash, 9 Alaska 701, decided July 26, 1940, wherein the same toll regulation which is involved in this case was in question under somewhat different facts and presumptions.

Defendants assert that this can be done only when the tolls are applied to the benefit of the road. They state that the regulation in this case provides that the tolls shall be

deposited with the Treasurer of the United States as miscellaneous receipts and that there is no limitation as to the use of the money so deposited.

The permanent appropriations repeal act, 48 Stat. 1227, 31 U.S.C.A. § 725c, approved June 26, 1934, provides:

"Sec. 4 [§ 725c.] (a) Effective July 1, 1935, all receipts of the character theretofore credited to the appropriation accounts appearing on the books of the Government and listed in subsection (b) of this section shall be deposited into the Treasury as miscellaneous receipts, and amounts equal thereto are authorized to be appropriated annually from the general fund of the Treasury for the same purposes for which such receipts are now appropriated. Appropriations to which expenditures under such accounts have been chargeable theretofore are hereby repealed, effective on such date: Provided, That if the total of receipts for any one fiscal year for any of the foregoing purposes under this authority is greater than the amounts appropriated for such purpose, such excess is authorized to be appropriated for the following fiscal year.

"(b) (1) Wagon roads, bridges, and trails, Alaska fund. * * * "

In conformity with said statute, congress made the following appropriations for roads, bridges, and trails in Alaska:

May 9, 1935, 49 Stat. 213:

"For the repair and maintenance of roads, tramways, ferries, bridges, and trails, Territory of Alaska * * * $500,000, including not to exceed $3,000 for repair and maintenance of Government wharf at Juneau, Alaska, to be immediately available.

"For the construction, repair, and maintenance of roads, tramways, bridges, and trails, Territory of Alaska, $150,-000, to be available until expended: Provided, That expenditures hereunder shall not exceed the aggregate receipts covered into the Treasury in accordance with section 4 of the Permanent Appropriation Repeal Act, 1934."

Act of June 22, 1936, 49 Stat. 1800:

"For the repair and maintenance of roads, tramways, ferries, bridges, and trails, Territory of Alaska * * * $525,000, including not to exceed $3,000 for repair and maintenance of Government wharf at Juneau, Alaska, to be immediately available.

"For the construction, repair, and maintenance of roads, tramways, bridges, and trails, Territory of Alaska, $130,-000, to be available until expended: Provided, That expenditures hereunder shall not exceed the aggregate receipts covered into the Treasury in accordance with section 4 of the Permanent Appropriation Repeal Act, 1934."

Act of August 9, 1937, 50 Stat. 612:

"For the repair and maintenance of roads, tramways, ferries, bridges, and trails, Territory of Alaska, * * * $535,000, including not to exceed $2,000 for repair and maintenance of Government wharf at Juneau, Alaska, to be immediately available.

"For the construction, repair, and maintenance of roads, tramways, bridges, trails, and aviation fields, Territory of Alaska, $130,000, to be available until expended: Provided, That expenditures hereunder shall not exceed the aggregate receipts covered into the Treasury in accordance with section 4 of the Permanent Appropriation Repeal Act, 1934."

Act of May 9, 1938, 52 Stat. 339:

"For the repair and maintenance of roads, tramways, ferries, bridges, and trails, Territory of Alaska, * * * $535,000, including not to exceed $1,500 for repair and maintenance of Government wharf at Juneau, Alaska, to be immediately available.

"For the construction, repair, and maintenance of roads, tramways, bridges, trails, and aviation fields, Territory of Alaska, $160,000, to be available until expended; Provided, That expenditures hereunder shall not exceed the aggregate receipts covered into the Treasury in accordance with

section 4 of the Permanent Appropriation Repeal Act, 1934."

Act of May 10, 1939, 53 Stat. 734:

"For the repair and maintenance of roads, tramways. ferries, bridges, and trails, Territory of Alaska * * * $560,000, including not to exceed $1,500 for repair and maintenance of Government wharf at Juneau, Alaska, to be immediately available.

"For the construction, repair, and maintenance of roads, tramways, bridges, trails, and aviation fields, Territory of Alaska, $140,000, to be available until expended: Provided, That expenditures hereunder shall not exceed the aggregate receipts covered into the Treasury in accordance with section 4 of the Permanent Appropriation Repeal Act, 1934."

Act of June 18, 1940, 54 Stat. 458:

"For the repair and maintenance of roads, tramways, ferries, bridges, and trails, Territory of Alaska * * * $570,000, including not to exceed $1,500 for repair and maintenance of Government wharf at Juneau, Alaska, to be immediately available.

"For the construction, repair, and maintenance of roads, tramways, bridges, trails, and aviation fields, Territory of Alaska, $150,000, to be available until expended: Provided, That expenditures hereunder shall not exceed the aggregate receipts covered into the Treasury in accordance with section 4 of the Permanent Appropriation Repeal Act, 1934."

Act approved June 28, 1941, Public No. 136, Chapter 259, 55 Stat. 358, of the appropriation for the Department of the Interior for the fiscal year ending June 30, 1942:

"For the construction, repair, and maintenance of roads, tramways, ferries, bridges, and trails, Territory of Alaska, to be expended under the provisions of the Act approved June 30, 1932 * * *, $684,500, including not to exceed $26,000 for repair and maintenance of Government wharf at Juneau, Alaska, to be immediately available.

"For the construction, repair, and maintenance of roads, tramways, bridges, and trails, Territory of Alaska, $150,-000, to be available until expended: Provided, That expenditures hereunder shall not exceed the aggregate receipts covered into the Treasury in accordance with section 4 of the Permanent Appropriation Repeal Act, 1934."

In the agreed statement of facts, it is shown that the defendants will be liable for tolls in the total sum of $3,-626.40 if the tolls are legally imposed. There is no showing in said statement as to the total amount of tolls collected, so the presumption would be, even without the provisions above mentioned in this paragraph, that the amount of tolls collected is less than the amount appropriated and used for the benefit of the Richardson Highway.

In Binns v. United States, 194 U.S. 486, 24 S.Ct. 816, 48 L.Ed. 1087, the Supreme Court had before it an act of congress fixing occupational license taxes in Alaska and providing that the same should be covered into the Treasury of the United States.

It was held:

194 U.S. at page 492, 24 S.Ct. at page 818, 48 L.Ed. 1087: "* * * if the act had provided for a local treasurer to whom these local taxes should be paid, and directed that the proceeds be used solely in payment of the necessary expenses of the government of Alaska, its constitutionality would be clear; but the contention is that the statute requires that the proceeds of these licenses shall be paid into the Treasury of the United States, from which, of course, they can only be taken under an act of Congress making specific appropriation. * * * "

194 U.S. at page 494, 24 S.Ct. at page 819, 48 L.Ed. 1087: "The presumptions are that the act imposing those taxes is constitutional, and anything essential to establish its invalidity which does not appear of record or from matters of which we can take judicial notice must be shown by the party asserting the unconstitutionality. * * *

"Does the fact that they are ordered to be paid into the Treasury of the United States, and not specifically appropriated to the expenses of the territory, when the sum total of these and all other revenues from the territory does not equal the cost and expense of maintaining its government, make them unconstitutional? * * * is it essential to their validity that the proceeds therefrom be kept constantly separate from all other moneys, and specifically and solely appropriated to the interests of the territory? We do not think that the constitutional power of Congress in this respect depends entirely on the mode of its exercise. If it satisfactorily appears that the purpose of these license taxes is to raise revenue for use in Alaska, and that the total revenues derived from Alaska are inadequate to the expenses of the territory, so that Congress has to draw upon the general funds of the nation, the taxes must be held valid."

It, therefore, appears that a proper disposition of the tolls was the deposit thereof with the Treasurer of the United States as miscellaneous receipts.

(c) Defendants further contend that this is not a toll but a tax imposed upon those transporting freight and that it is invalid as not being levied according to law.

In Binns v. United States, 194 U.S. 486, 24 S.Ct. 816, 48 L.Ed. 1087, a license tax on persons following designated businesses within Alaska, was required.

194 U.S. at page 490, 24 S.Ct. at page 817, 48 L.Ed. 1087: "The contention of plaintiff in error is that the license tax is an excise, that it is laid and collected 'to pay the debts and provide for the common defense and general welfare of the United States,' because, by § 463, it is provided that 'all moneys received for licenses * * * under this act shall * * * be covered into the Treasury of the United States;' that it is imposed only in Alaska; and is not 'uniform throughout the United States.'"

194 U.S. at page 491, 24 S.Ct. at page 817, 48 L.Ed. 1087: "We shall assume that the purpose of the license

fees * * * is the collection of revenue, and that the license fees are excises within the constitutional sense of the terms. Nevertheless, we are of opinion that they are to be regarded as local taxes, imposed for the purpose of raising funds to support the administration of local government in Alaska."

194 U.S. at page 494, 24 S.Ct. at page 819, 48 L.Ed. 1087: "The presumptions are that the act imposing those taxes is constitutional, and anything essential to establish its invalidity which does not appear of record or from matters of which we can take judicial notice must be shown by the party asserting the unconstitutionality."

■ Nothing has been shown by the defendants supporting their theory, and the act of congress and regulation relative to the toll show it to be a toll and not a tax.

(d) Defendants also allege that the regulation in question is class and local legislation and invalid.

■ The class legislation which is forbidden by the Constitution of the United States does not apply to citizens of the United States who are not residents of a state but are residents of a territory. 12 C.J., § 825, p. 1109; 16 C.J.S., Constitutional Law, § 457.

■ The class legislation which is forbidden by the Fourteenth Amendment to the Federal Constitution is an abridgement of the power of the states only and is not an abridgement of the power of the Federal Government. 12 C.J., § 826, p. 1111; 16 C.J.S., Constitutional Law, § 458; 16 C.J.S., Constitutional Law, § 489, p. 954.

■ Nor would the law and regulation in question constitute class or local legislation.

The act of Congress, approved July 30, 1886, 24 Stat. 171, 48 U.S.C.A. § 1471; § 125, C.L.A.1933, forbids legislatures of territories from passing local laws in enumerated cases or in any case where a general law could be made applicable. There is no prohibition, however, against con-

160

gress itself passing such a law, so there would be no such limitation as to the regulation in question.

The fact that pleasure cars and transporters of passengers for hire and toll stations at other points are not provided for by the regulation cannot be complained of by the defendants.

See 16 C.J.S., Constitutional Law, § 490, p. 959, wherein it states: " * * * and the classification will not be overthrown because it does not extend to all subjects which legitimately might be included, * * * or because it rests on narrow distinctions, provided it is based on a practical distinction. * * * "

It is entirely conceivable, and the presumption will be indulged in until the contrary is shown, that the establishment of other toll stations would result in an expense which would not be justified by the additional revenue thereby procured.

"Class legislation, a term often carelessly used, and often called local or private legislation, consists of those laws which are limited in their operation to certain persons or classes of persons, natural or artificial, or to certain districts of the territory of the state. * * * However, class legislation is not expressly named in the prohibitions of the state and federal constitutions; and neither the fourteenth amendment nor the provisions of the state constitutions prohibiting the granting of special privileges affect the validity of state statutes making reasonable classifications of persons or things for the various purposes of legislation. If there is a reasonable ground for the classification and the law operates equally on all within the same class it is valid. And this is true even though the act confers different rights or imposes different burdens on the several classes. * * * In determining whether or not a basis of classification is reasonable, it must be looked at from the standpoint of the legislature enacting it, the question of classification being primarily for the legislature. A statute will be sustained where the basis for classification made

by it could have seemed reasonable to the legislature, even though such basis seems to the courts to be unreasonable." 12 C.J., pp. 1128, 1129; 16 C.J.S., Constitutional Law, § 489.

In Alaska Fish Salting & By-Products Company v. Smith, 255 U.S. 44, 41 S.Ct. 219, 5 Alaska Fed. 20, 65 L.Ed. 489, the tax imposed by the legislature upon producers of fish oil, etc., from herring was under consideration.

The act of congress creating a legislative assembly in Alaska provided, in section 9, 37 Stat. 514, § 78, Title 48, U.S.C.A., that "All taxes shall be uniform upon the same class of subjects * * *". Another portion of the same section 9, Sec. 77, Title 48, U.S.C.A. stated: " * * * nor shall the legislature pass local or special laws in any of the cases enumerated in the act of July 30, 1886 [section 1471 of this title]; * * *."

The last mentioned act, being section 1471, Title 48, U.S. C.A., Sec. 125, C.L.A., 1933, forbade the legislatures of territories to pass local or special laws "for the assessment and collection of taxes for Territorial, county, township, or road purposes."

The tax was attacked as being unconstitutional and against the above mentioned section 9, as not being uniform as required by section 9 above mentioned and as being discriminatory in that it placed a greater tax upon products produced from herring than the same product produced from offal of salmon.

The court held: (255 U.S. at page 48, 41 S.Ct. at page 220, 5 Alaska Fed. 20, 65 L.Ed. 489.)

"We * * * assume * * * the questioned Acts do bear more heavily upon the use of herring for oil and fertilizer than they do upon the use of other fish. But there is nothing in the Constitution to hinder that. If Alaska deems it for its welfare to discourage the destruction of herring for manure and to preserve them for food for man or for salmon, and to that end imposes a greater tax upon

that part of the plaintiff's industry than upon similar use of other fish or of the offal of salmon, it hardly can be said to be contravening a Constitution that has known protective tariffs for a hundred years. ·* * * Even if the tax should destroy a business it would not be made invalid or require compensation upon that 'ground alone. Those who enter upon a business take that risk. * * * "

(255 U.S. at page 49, 41 S.Ct. at page 220, 5 Alaska Fed. 20, 65 L.Ed. 489.) "The requirement of uniformity in section 9 is disposed of by what we have said of the· classification when considered with reference to the Constitution. The legislature was warranted in treating the making of oil and fertilizer from herring as a different class of subjects from the making of the same from salmon offal. * * * "

In Pacific American Fisheries v. Alaska, 269 U.S. 269, 46 S.Ct. 110, 5 Alaska Fed. 285, 70 L.Ed. 270, a suit by the Territory to recover license taxes upon salmon packed by the defendant at four canneries, the Territorial legislature had placed a base tax of ten cents per case on all salmon canned. A graduated additional tax was imposed on larger outputs as follows: where from ten thousand to twenty thousand cases, five cents per case additional; where from twenty-five thousand to forty thousand, ten cents per case additional; where from forty thousand to fifty thousand, fifteen cents per case additional; where in excess of fifty thousand cases, twenty cents per case additional.

Petitioner said the classification upon which the said tax was based was unreasonable and contrary to the Fifth Amendment of the Constitution of the United States.

The court held (269 U.S. at page 278, 46 S.Ct. at page 111, 5 Alaska Fed. 285, 70 L.Ed. 270): "Classification of taxes by the amount of the corpus taxed has been sustained in various connections heretofore. * * * The inequalities of the tax are based upon intelligible grounds of policy and cannot be said to deny the petitioner its constitutional rights."

 (e) Defendants further maintain that the law in question is an unconstitutional interference with interstate commerce, citing Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, 38 A.L.R. 286, and Bush & Sons Co. v. Maloy, 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627.

Those cases hold that the state cannot interfere with interstate commerce. The decisions are based upon the fact that article 1, section 8 of the Constitution reserves to congress alone the regulation of interstate commerce.

Such a restriction cannot apply in this case.

 (f) Invoking the rule as to statutes in pari materia, counsel for defendants states that the act of congress of June 30, 1932, 47 Stat. 446, 48 U.S.C.A. § 321a et seq., giving the Secretary of the Interior, with the approval of the President, the power to make rules and regulations governing the use of roads, including the fixing and collection of tolls, merely gave the Secretary of the Interior a right relative to tolls upon roads constructed under section 6 of the act approved May 14, 1898, giving private persons and corporations a right to construct, at their own expense, wagon roads and to charge and collect tolls for the use thereof, the rates of toll to be approved by the Secretary.

Said act of June 30, 1932, is entitled, "Providing for the transfer of the duties authorized and authority conferred by law upon the board of road commissioners in the Territory of Alaska to the Department of the Interior, and for other purposes."

Section 1 provides: " * * * the duties * * * conferred by law upon the board of road commissioners * * * and upon the Secretary of War, as provided for in the Act of January 27, 1905 (ch. 277, sec. 2, 33 Stat. 616), as amended by the Act of May 14, 1906 (ch. 2458, sec. 2, 34 Stat. 192), and Acts supplemental thereto, and amendatory thereof, are hereby transferred to the Department of the Interior * * *."

The title and the substance of said act of June 30, 1932, deal only with roads and trails which have been built or

maintained by the board of road ·commissioners and the Secretary of War with public funds. It does not purport to and could not possibly refer to the private toll roads built under the act approved May 14, 1898.

To authorize the Secretary of the Interior to take jurisdiction over private toll roads and to collect the tolls would be an absolute repeal of the act of May 14, 1898, and would constitute the taking of private property without due process of law.

Such·a construction cannot be accepted.

IV. (a) Defendants likewise urge that the regulation fixing tolls creates a monopoly in the Alaska Railroad; constitutes a restraint of trade; eliminates competition; does not operate uniformly; and deprives the defendants of a lawful occupation. These matters, defendants' counsel asserts, are violative of the Sherman Anti-Trust Act, 15 U.S. C.A. §§ 1–7, 15 note. He cites cases where private corporations have been held to have violated that act.

It is believed that such anti-trust laws do not apply to congress or the acts of its duly delegated agent unless such acts constitute a violation of a right given by the constitution of the United States.

In Sunshine Anthracite Coal Co. v. Adkins, ·etc., 310 U.S. 381, on page 394, 60 S.Ct. 907, on page 913, 84 L.Ed. 1263, it is stated:

"But appellant claims * * * that the consuming public will be deprived of the wholesome restriction of the anti-trust laws. Those matters, however, relate to questions of policy, to the wisdom of the legislation, and to the appropriateness of the remedy chosen—matters which are not our concern. If we endeavored to appraise them we would be trespassing on the legislative domain. * * *"

310 U.S. at page 395; 60 S.Ct. at page 913, 84 L.Ed. 1263: "To invalidate this Act we would have to deny the existence of power on the part of Congress under the commerce clause to deal directly and specifically with those

forces which in its judgment should not be permitted to dislocate an important segment of our economy and to disrupt and burden interstate channels of trade. That step could not be taken without plain disregard of the Constitution. * * * If the industry * * * * had endeavored to stabilize the markets through price-fixing agreements, it would have run afoul of the Sherman Act. * * * But that does not mean that there is a no man's land between the state and federal domains. Certainly what Congress has forbidden by the Sherman Act it can modify. * * . * It may single out for separate treatment, as it has done on various occasions, a particular industry and thereby remove the penalties of the Sherman Act as respects it. * * * The commerce clause empowers it to undertake stabilization * * *."

310 U.S. at page 400, 60 S.Ct. at page 916, 84 L.Ed. 1263: "Appellant contends that the statutory classification of coal into code and non-code classes and the application of the 19½% tax to the latter are improper under the Fifth Amendment. * * * But the Fifth Amendment, unlike the Fourteenth, has no equal protection clause. Steward Machine Co. v. Davis, 301 U.S. 548, 584, 57 S.Ct. 883, 889, 81 L.Ed. 1279, 109 A.L.R. 1293, and cases cited. And there is 'no requirement of uniformity in connection with the commerce power.' * * * Coercion is the very essence of any penalty exacted for failure of submission. 'It is of the essence of the plenary power conferred' by the commerce clause 'that Congress may exercise its discretion in the use of the power.' Currin v. Wallace, supra, 306 U.S. [1], at page 14, 59 S.Ct. 379 at page 386, 83 L.Ed. 441. A part of that discretion is the selection of the sanction for the law's enforcement. Discrimination constitutionally may be the price of non-compliance. 'Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts.' * * *"

Under Article IV of the Constitution of the United States, "The Congress shall have Power to dispose of and

make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; * * *." It is said in Binns v. United States, 194 U.S. 486, 24 S.Ct. 816, 817, 48 L.Ed. 1087: "It must be remembered that Congress, in the government of the territories as well as of the District of Columbia, has plenary power, save as controlled by the provisions of the Constitution * * *."

In Gill v. City of Dallas, Tex.Civ.App., 209 S.W. 209, writ of error dismissed, 252 U.S. 588, 40 S.Ct. 343, 64 L.Ed. 730, plaintiff was running a jitney bus under a license from the city. Later a city ordinance was passed excluding all jitneys from operating in a large central area served by the street cars. Plaintiff alleged that the ordinance created a monopoly in favor of the street cars, monopolies being forbidden by the state constitution. He further alleged and the court concluded that the effect of the ordinance was to abolish jitneys.

It was held (209 S.W. at page 212):

"It is also contended that the ordinance is void because in violation of sections 1 and 26, article 1, Const., forbidding monopolies, the precise point being that the ordinance, by abolishing jitneys, creates a monopoly in favor of the street railways. * * * it is alleged in the petition that it was the purpose of appellees' officers to abolish and prohibit the operation of jitneys in the city of Dallas by the enactment of the ordinance complained of and that such was its effect. The allegation is to be accepted as a fact unless the contrary appears * * *. We conclude the effect of the ordinance was to abolish the jitneys, whatever may have been the intention of appellee's officers. * * * yet the ordinance, in our opinion, would not be void because it creates a monopoly within the contemplation of the Constitution. * * * the mere refusal of a municipality to grant a franchise or permission to others who desire to compete with those already in possession of a franchise or permit does not, in our opinion, create a monopoly. * * *

Sufficient public utilities are a great convenience; too many might be an equal inconvenience, to be determined in every case by the local authorities. * * * The Officers of municipalities are charged with the responsibility of conserving the convenience of the citizens * * *. Whether they have fairly done so is obviously not a judicial question."

In Parsons v. City of Galveston, Tex.Civ.App., 53 S.W. 2d 160, 162, plaintiff operated a dime taxi, and the city passed an ordinance making a minimum charge, which was above plaintiff's regular charge. The plaintiff challenged the constitutionality of the ordinance as violative of the constitution of the state of Texas and also the Fourteenth Amendment to the Constitution of the United States.

Parsons v. City of Galveston: Held: "Appellants appear, in limine, to labor under two misconceptions as to their legal status in an action such as they brought: (1) That they had an inherent or vested right to carry on the business of a common carrier of passengers for hire over the public streets of the city of Galveston, as they had been doing; * * *.

"Neither position is tenable; in the first place * * * in the absence of a showing of the vouchsafing of such a right to others, the prerogative of controlling the use of the streets for private business purposes is one for the state itself—or a city to which it has delegated that power—to exercise, as it sees fit, without contravening any of the constitutional provisions here invoked by appellants. * * * the extent to which the citizen seeks to use the city streets has much to do with the reaches of the public power over them in relation to him; he may use them in the ordinary way for purposes of travel or transportation of property in the usual course of life or business, as an inherent privilege, common alike to all who are similarly situated, that may be reasonably regulated, though not entirely taken from him; but he has no vested right to conduct his private business for profit exclusively within their limits and over the facilities they afford—that being an exceptional or pecu-

liar burden that is always subject to the will of the state, or of the political subdivision to which that attribute of sovereignty has been delegated; * * *."

In Giglio v. Barrett et al., 207 Ala. 278, 92 So. 668, 672, the city ordinance specified routes over which jitney buses might be run.

Plaintiff had a state taxi license. He maintained the city ordinance was invalid as discriminating against him. It was held that "It is settled law that—

" 'One who assails the classification in a statute (on the ground that it is discriminatory and unreasonable) must carry the burden of showing that it does not rest on any reasonable basis, but is essentially arbitrary.' * * *."

92 So. at page 672: "As in the instant bill, it was shown in the Orpheum Taxi Co. Case, supra [Montgomery v. Orpheum Taxi Co., 203 Ala. 103, 82 So. 117] * * *:

" 'It is manifest that, if the complainant's business is not a public utility, * * * it is undoubtedly a "private enterprise" within the meaning of section 220 of the Constitution. It is hardly necessary to add that the complainant's * * * authority to conduct its taxicab business was and is subject to the provisions of section 220 of the Constitution, as well as the effect of the statutes conferring on the municipality the power to exact licenses of those using the streets in the prosecution of their enterprises and to regulate in the interest of the public safety and welfare the use of the streets by persons and vehicles.' "

92 So. at page 673: " * * * The several provisions of the ordinance challenged are within the police power of government delegated to the municipality for the purpose and under the public policy dictating and warranting the same.

"No right of the complainant, guaranteed by the Fourteenth Amendment to the Constitution of the United States or by the Constitution of Alabama was infringed or denied * * *."

In Stanley v. Public Utilities Commission, 295 U.S. 76, 55 S.Ct. 628, 79 L.Ed. 1311, the laws of Maine provided that common carriers operating motor vehicles for transportation of goods for hire should obtain certificates of public convenience and necessity. These were granted as a matter of right to carriers who had been in continuous service since March 1, 1932. Plaintiff was denied a certificate for operation over a portion of the route he had selected, the Commission finding that there were several common carriers entitled to certificates as a matter of right over said route.

Complaining that this determination deprived him of his property without due process of law and denied him the equal protection of the laws, the plaintiff brought suit.

It was held: "Appellant's contentions are without merit. * * * the Legislature could determine, within reason, as of what period the service of carriers for hire over its highways did not impair their use or cause congestion, and require certificates for those seeking to supply additional transportation for a later period. The selection of any date would necessarily establish a distinction between service immediately before and after, but that, like similar selections of distances, weights and sizes, would not of itself prove that the choice is beyond the range of legislative authority. * * * There is no ground for concluding that the Legislature transgressed the bounds of permissible discretion in this case. * * *"

The ultimate complaint of the defendants is that the imposition of the toll takes away their profit as carriers of freight over the Richardson Highway. There is nothing in this case indicating that the public in Fairbanks and vicinity could not pay such increased freight rates to the defendants as would cover the toll and a reasonable profit for them. It is clear that the only reason the toll eliminates the profit of the defendants is that the freight rates of the Alaska Railroad are such that the defendants cannot raise their rates to include the toll and still get busi-

ness. It is, then, the Alaska Railroad freight rates that cause the defendants to lose profits, the toll, of course, being an indirect cause.

In the case of Alabama Power Co., Petitioner, v. Ickes, Federal Administrator of Public Works, et al., Respondents, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, the respondent Ickes had arranged to make loans and grants of money to several municipalities in Alabama in aid of the construction of municipal light and power plants. It was held (302 U.S. at page 475, 58 S.Ct. at page 302, 82 L. Ed. 374):

"The injury which petitioner will suffer, it is contended, is the loss of its business as a result of the use of the loans and grants by the municipalities in setting up and maintaining rival and competing plants; * * *"

302 U.S. at page 479, 58 S.Ct. at page 303, 82 L.Ed. 374: "The only pertinent inquiry, then, is, What enforceable legal right of petitioner do the alleged wrongful agreements invade or threaten? * * * The claim that petitioner will be injured, perhaps ruined, by the competition of the municipalities brought about by the use of the moneys, therefore, presents a clear case of damnum absque injuria. Stated in other words, these municipalities have the right under state law to engage in the business in competition with petitioner, since it has been given no exclusive franchise. If its business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition from which no legal wrong results.

"What petitioner anticipates, we emphasize, is damage to something it does not possess—namely, a right to be immune from lawful municipal competition. * * *"

A decree against petitioner was affirmed.

In Tennessee Electric Power Co. et al., Appellants, v. Tennessee Valley Authority et al., Appellees, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543, nineteen corporations engaged in the business of generating and distributing electricity filed a bill alleging that the Tennessee Valley Authority, by

competing with them in the sale of electric energy, was destroying their property and their rights, contrary to the Constitution. They further alleged that Harold L. Ickes, as Administrator of the Federal Administration of Public Works, and the Tennessee Valley Authority, had adopted an unlawful plan whereby Ickes had announced loans and grants of Federal funds to municipalities which would purchase power from the Authority and refused loans to other systems.

It was held (306 U.S. at page 137, 59 S.Ct. at page 369, 83 L.Ed. 543):

" * * * It is clear, therefore, that its [T.V.A.] acts, have resulted and will result in the establishment of municipal and cooperative distribution systems competing with those of some or all the appellants in territory which they now serve, or reasonably expect to serve by extension of their existing systems, and in direct competition with the appellants' enterprises through the sale of power * * *. The appellants assert that this competition will inflict substantial damage upon them. The appellees admit that such damage will result, but contend that it is not the basis of a cause of action since it is damnum absque injuria;—a damage not consequent upon the violation of any right recognized by law."

306 U.S. at page 139, 59 S.Ct. at page 370, 83 L.Ed. 543: "The franchise to exist as a corporation, and to function as a public utility, in the absence of a specific charter contract on the subject, creates no right to be free of competition, and affords the corporation no legal cause of complaint by reason of the state's subsequently authorizing another to enter and operate in the same field. * * *"

306 U.S. at page 140, 59 S.Ct. at page 371, 83 L.Ed. 543: " * * * The contention is foreclosed by prior decisions that the damage consequent on competition, otherwise lawful, is in such circumstances damnum absque injuria, and will not support a cause of action or a right to sue."

306 U.S. at page 146, 59 S.Ct. at page 374, 83 L.Ed. 543: "Cooperation by two federal officials * * * in competition with the appellants, does not spell conspiracy to injure their business. * * * "

The decree dismissing the bill was affirmed.

■ (b) As Congress gave the Secretary of the Interior the authority to impose a toll where deemed necessary or advisable in the public interest and as the Secretary of the Interior imposed the toll, the court can only conclude that it was thought, by the Secretary of the Interior, to be for the benefit of the public interest in Alaska that tolls should be imposed. That Congress and the Secretary of the Interior were honest in their intentions to benefit the public by eliminating competition in freight hauled over the highway must be assumed. ·59 C.J. 1009.

The following possible concepts on the part of Congress and the Secretary of the Interior may have existed: That competition over the highway might cause the closing down of the railroad altogether or during the winter months and that the public would be the great loser thereby; that continued freighting over the highway would cause a discontinuance of appropriations to maintain the highway, thereby causing it to become unusable by tourists and for other passenger service to the great detriment of the public; that curbing the hauling of freight over the highway would cause the Alaska Railroad to become self-supporting, thereby releasing funds for the improvement of the highway to the great benefit of the public; that the Richardson Highway, being a dirt road only, could not bear much freight traffic without being deteriorated, thereby injuring its availability to passenger service; that it was more important to have the highway used by sight-seers, pleasure seekers, and passenger service than by freight carriers and that such passenger use would benefit the greater portion of the public than freight service; that trucking concerns used or were apt to use large trucks which on the narrow Richardson Highway became dangerous to other vehicles.

The possible existence of any of the above motives takes away the power of the Court to declare the toll invalid.

■ V. (a) Defendants assert that the act of June 30, 1932, unlawfully delegated a legislative power to the Secretary of the Interior. This question was treated by this Court in the case of Gordon v. Nash, 9 Alaska, page 701. See, also, Gill v. City of Dallas, Tex.Civ.App., 209 S.W. 209, writ of error dismissed, 252 U.S. 588, 40 S.Ct. 343, 64 L.Ed. 730, wherein the city ordinance excluded jitneys from the central portion of the city which was served by the street cars. On page 212 of 209 S.W., the court said:

"It is also claimed that the ordinance is void because it is an attempted exercise of the legislative power reserved to the state by section 1, art. 3, of the Constitution. While all legislative power is reserved to the state, that power may, of course, be delegated to other governmental agencies, and we have heretofore held in a number of cases that the power exercised in the ordinance was delegated to the city of Dallas, and that it was such power as the Legislature was authorized to delegate."

■ (b) Defendants also urge that the regulation imposing tolls is invalid, because the Secretary of the Interior made no findings to the effect that it was necessary or advisable in the public interest to impose a toll.

In Pacific States Box & Basket Co. v. White et al., 296 U.S. 176, 56 S.Ct. 159, 163, 80 L.Ed. 138, 101 A.L.R. 853, where the same objection had been urged, the court said: "It is contended that the order is void because the administrative body made no special findings of fact. But the statute did not require special findings; * * *."

As the act of June 30, 1932, did not require special findings, the promulgation of the regulation was in itself a finding that it was necessary or advisable in the public interest.

174

■ The validity of the toll regulation is therefore · upheld.

Judgment may be drawn in accordance herewith and covering the matters set forth in the agreed statement of facts.